**PUBLISHED**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **MICHAEL WILLIAM LENZ**, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 7:04CV00347 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **WILLIAM PAGE TRUE,** | ) | By: James P. Jones |
| **WARDEN, SUSSEX I STATE** | ) | Chief United States District Judge |
| **PRISON**, | ) | |
| | ) | |
| Respondent. | ) | |

*Jennifer L. Givens, Virginia Capital Representation Resource Center, Charlottesville, Virginia, and James C. Turk, Jr., Stone Harrison & Turk, P.C., Radford, Virginia, for Petitioner; Paul C. Galanides, Assistant Attorney General of Virginia, Richmond, Virginia, for Respondent.*

Petitioner Michael William Lenz, an inmate at a Virginia correctional facility, was convicted in state court of the capital murder of a fellow inmate and sentenced to death. After unsuccessfully challenging his conviction and the imposition of the death penalty both on direct appeal and in state collateral proceedings, Lenz now petitions for a writ of habeas corpus pursuant to 28 U.S.C.A. § 2254 (West 1994 & Supp. 2004). For the reasons stated in this opinion, the respondent's Motion to Dismiss must be granted.

T<small>ABLE OF</small> C<small>ONTENTS</small>

I.      Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

II.     Procedural History  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

        A.      State Proceedings  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

        B.      Federal Proceedings  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

III.    Procedurally Defaulted Claim  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

IV.     Claims on the Merits  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

        A.      Claim I—Presence of a Bible in the Jury Room  . . . . . . . . . .  21

        B.      Claim II—Counsel's Failure to Object to the
                Verdict Forms  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

        C.      Claim III—Counsel's Failure to Object to Use of the
                Stun Belt  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

        D.      Claim IV—Suppression of Evidence about the Victim's
                Criminal History  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

        E.      Claim VI—Counsel's Failure to Prepare for the Penalty
                Phase of Trial  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53

                1.      Claim VI(A)—Counsel's Failure to Seek
                        Additional Time  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  54

                2.      Claim VI(B)—Evidence Regarding the
                        Circumstances of the Offense  . . . . . . . . . . . . . . . . . .  57

                3.      Claim VI(C)—Evidence Regarding Lenz's
                        Religion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  64

Case 7:04-cv-00347-JPJ   Document 58-1   Filed 05/20/05   Page 2 of 107   Pageid#: 331

4.      Claim VI(D)—Evidence Regarding Lenz's
        Background  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

5.      Claim VI(E)—Evidence Regarding Lenz's Mental
        Illness  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

6.      Claim VI(F)—Failure to Obtain Independent
        Expert Assistance  . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

7.      Claim VI(G)—Cumulative Prejudice  . . . . . . . . . . . . . 94

F.      Claim VII—Counsel's Failures on Direct
        Appeal  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

G.      Claim VIII—Constitutionality of the Death Penalty in
        Virginia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

V.   Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

## I. FACTS.

In affirming Lenz's conviction and sentence on direct appeal, the Supreme

Court of Virginia summarized the facts as follows:

> During the early evening of January 16, 2000, the defendant, [Brent H.] Parker, Jeffrey Remington, and three other inmates attended a meeting of a group referred to as the Ironwood Kindred. The meeting occurred in Building J-5, which is a part of the Augusta Correctional Center.

> Earl Jones, a correctional officer, was assigned to Building J-5 that evening. Jones permitted the six inmates to enter a room where the meeting occurred. He closed the door, which contained windows, and "secured" the room.

As Jones sat down at his post outside the meeting room and began to "sort through" inmate passes that he had collected, he "noticed a commotion." Jones "got on" his radio and requested help from other correctional officers because he observed a fight. As Jones walked toward the room where the inmates were meeting, three of the inmates "ran out of the room," and one of the inmates said, "[t]hey're stabbing him."

Jones went to the door and saw "Remington and Lenz stabbing Parker." Parker was lying "on his back; on the floor, between Remington and Lenz." Parker "was making a feeble attempt to defend himself. . . . He had his hands up." As Parker tried to use his hands to "block" the knives from piercing his body, the defendant and Remington "took their free hand[s]; pushed [Parker's] hands aside and then stabbed him."

Jones opened the meeting room door and ordered the defendant and Remington to stop stabbing Parker. Jones testified, "[t]hey simply looked at me and went back to stabbing him." Jones used his radio again to request help and asked his fellow correctional officers to hurry because Remington and the defendant "were trying to kill this guy." Jones did not go into the room because Remington and the defendant had knives, and Jones was unarmed.

Edward V. Houching, a correctional officer, responded to Jones' request for assistance. When Houching arrived at the meeting room, he saw the defendant and Remington stab Parker between 10 to 15 times as Parker was lying on the floor in a fetal position. Like Jones, Houching ordered the defendant and Remington to stop, but they continued to stab Parker. Parker was not "doing anything to defend himself," and the defendant "was bent over, stabbing [Parker], over and over and over."

Within a few seconds after Houching arrived at the meeting room, two sergeants and correctional officer John Edward Simmons also responded. Simmons saw the defendant stab Parker six or seven times in an area that extended from Parker's "underarm" to his waist as Parker was lying on his side on the floor. Simmons also saw Remington stab

- 4 -

Parker in the shoulder and back. After a sufficient number of correctional officers arrived at the meeting room, the officers, some of whom were armed with mace, entered the room, and Simmons told the defendant and Remington "to drop" their knives. The defendant placed his knife on a table, and Remington eventually surrendered his knife. The officers placed handcuffs on the defendant and Remington and escorted them from the area.

Rita K. Dietz, a registered nurse employed at the Augusta Correctional Center, rendered emergency assistance to Parker. When she walked into the meeting room to assist him, he was "very pale" and "surrounded by blood." As she approached him, she noticed that his shirt was soaked in blood. She ripped his shirt off. She testified that "[e]very time I encountered a couple of wounds, I encountered more wounds." She described Parker's medical condition as "[v]ery critical." She placed bandages on his wounds until she "ran out." She testified,

> at that point, the stretcher had arrived. So we took the sheet off the stretcher . . . Parker was still alive, and he helped roll onto the sheet. And we lifted the sheet up, which the one wound, out of the left side, just poured like water; like somebody had turned a faucet on, when we lifted him. And we got him on the stretcher.

Parker was transported by ambulance to the Augusta Medical Center, where he died.

Gregory Price Wanger, the Assistant Chief Medical Examiner for the Western District of Virginia, performed an autopsy on Parker's body. Wanger testified that Parker had sustained 68 stab wounds and one cut wound, all of which were inflicted upon Parker when he was alive. Dr. Wanger explained that a stab wound is "shorter on the surface than it is deep" and "implies a thrusting motion[,]" whereas a cut wound "is longer on the surface than it is deep" and "implies a slashing-like motion." The stab wounds penetrated Parker's chest, abdomen, back, left arm, and right forearm.

- 5 -

Dr. Wanger identified 40 stab wounds, "from the upper part of [Parker's] chest down through the middle and center part of the chest, and into the abdomen." These wounds all contributed to his death. Parker's left lung and liver were stabbed seven times each and the wounds produced serious internal bleeding. The wounds to Parker's lungs would have been fatal without the other wounds. Additionally, "the wounds to the liver; by themselves, would have been fatal without the other wounds to [his] body."

*Lenz v. Commonwealth*, 544 S.E.2d 299, 301-02 (Va. 2001) ("*Lenz I*").

During the sentencing phase of the trial, the jury heard evidence from the Commonwealth regarding the defendant's prior convictions for possession of a firearm after having been convicted of a felony, and breaking and entering. *Id*. at 302. The jury also heard the following mitigation evidence from the defendant:

Martin Rogozinski, a psychologist employed at the Augusta Correctional Center, testified that he spoke with the defendant soon after Parker was murdered and that it was Rogozinski's opinion that the defendant had murdered Parker based "solely on a religious conviction."

The defendant testified during the penalty phase. He stated that he was a practicing member of the "Asatru" religion. According to the defendant, several inmates had approached him and asked him to "construct" an Asatru group, but his efforts to do so were "thwarted" by Parker.

The defendant testified that on the evening of the murder, he planned to perform an Asatru ceremony in the meeting room. The defendant recited poetic literature and then asked Parker to approach an altar. The defendant testified that

I called [Parker] up to the altar and I asked—and I said to him, "It's been a long, hard path between us." And

- 6 -

[Parker] said, "Yes, it is." And I pulled the knife out of my pocket. And I said, "Are you trying to take it to the next step?" And he said, "Yes, I am." And so I stabbed him.

The defendant admitted that he did not like Parker, that he had planned to kill Parker that day, and that he had threatened others in the meeting room with the knife.

The defendant presented the testimony of Gary Lee Bass, the Chief of Operations at the Virginia Department of Corrections and Jerry Wayne Armentrout, the Assistant Warden of Operations at the Red Onion State Prison. Bass and Armentrout testified about "prison life" and the security conditions that the defendant would encounter at a Virginia maximum security correctional facility if he were sentenced to life imprisonment. Two officers assigned to the Augusta Correctional Center testified that the defendant had never given them any problems while he was under their supervision.

Patricia Daley Lenz, the defendant's mother, testified about his childhood and family interaction. She stated that the defendant's biological father was absent during much of the defendant's early childhood and that the defendant's adoptive father was very strict and favored his biological child.

*Id*. at 302-03.

## II. PROCEDURAL HISTORY.

### A. STATE PROCEEDINGS.

Lenz, an inmate at the Augusta Correctional Center, was indicted in Augusta County for the January 16, 2000, capital murder of Brent H. Parker. The Circuit Court of Augusta County appointed him counsel. Following a two-day trial, July 26-27,

- 7 -

2000, the jury found Lenz guilty of capital murder and, on July 28, 2000, fixed his punishment at death. The trial court entered a final order on October 20, 2000, sentencing Lenz to death in accordance with the jury's verdict.

Still represented by trial counsel, Lenz appealed his conviction and death sentence on eighteen grounds. The Supreme Court of Virginia unanimously affirmed the conviction and the sentence on April 20, 2001. *See Lenz I*, 544 S.E.2d at 311. Thereafter, Lenz sought a writ of certiorari in the Supreme Court of the United States, which was denied on October 29, 2001. *See Lenz v. Virginia*, 534 U.S. 1003 (2001).

Lenz filed a petition for a writ of habeas corpus with the Supreme Court of Virginia on December 28, 2001, and the court appointed new counsel. After being granted leave to file an amended petition on or before January 11, 2002, Lenz filed a petition asserting ten claims.[1]

_____

[1] Lenz's state habeas petition asserts that

I.  Lenz was deprived of his rights to counsel and to be present at all critical stages of the proceedings, due process of law and a fair and reliable sentencing determination when the bailiff provided ex parte responses to juror questions regarding the sentencing instructions;

II. Lenz was denied his rights under the Sixth, Eighth, and Fourteenth Amendments where jurors read from and relied upon passages in the Bible in determining whether to sentence Lenz to life or death;

III. Trial counsel's failure to object to the Department of Corrections' unilateral decision to place a stun belt on Lenz throughout his trial, without any showing of need, denied Lenz his rights to be tried without restraint, to effective assistance of counsel, and to a fair trial;

- 8 -

On June 17, 2002, the Virginia Supreme Court ordered the Circuit Court of Augusta County to conduct an evidentiary hearing on Claims I and II and took the remaining claims under advisement. In Claim I, Lenz alleged that the bailiff provided ex parte responses to juror questions regarding the sentencing instructions, violating several of his constitutional and statutory rights. In Claim II, Lenz alleged that jurors read from and relied upon passages in the Bible when determining whether to sentence

---

IV. Lenz's counsel were ineffective for failing to object to verdict forms which did not comport with the trial court's instructions, Virginia law and federal constitutional requirements;

V. Lenz was denied his right to counsel at a critical stage of the proceedings due to the trial court's refusal to order that Lenz be transported to a location where he could have reasonable access to his attorneys until a week before his capital trial commenced, and due to the conditions under which the Commonwealth forced trial counsel to consult with Lenz during the months prior to his trial;

VI. Counsel unreasonably failed to effectively voir dire prospective jurors and investigate and discover juror misconduct;

VII. Counsel rendered ineffective assistance during the sentencing phase;

VIII. Counsel were ineffective for failing to object to jury instructions that incorrectly permitted the jury to convict Lenz of capital murder even if they did not find that the Commonwealth had proved beyond a reasonable doubt that Lenz was not the actual perpetrator of the victim's death;

IX. Lenz was denied effective assistance of counsel on direct appeal because counsel failed to preserve, raise and cogently argue meritorious issues; [and]

X. The death penalty in Virginia is unconstitutional.

(App. 166-209 (capitalization altered).)

him to life or death, violating his rights under the Sixth, Eighth, and Fourteenth Amendments. The evidentiary hearing was held on August 9, 2002, and in an October 7, 2002 report, the state trial judge made findings of fact and recommended conclusions of law to the Virginia Supreme Court. Lenz filed his objections on November 8, 2002, and the court heard oral argument on Claims I and II.

The Supreme Court of Virginia issued an opinion on April 17, 2003, granting the petition as to Claim IV, in which Lenz alleged that trial counsel were ineffective for failing to object to use of the statutory sentencing verdict form, refusing to consider claims relating to his prior sentencing hearing, and denying the petition as to all other claims. *Lenz v. Warden of the Sussex I State Prison*, 579 S.E.2d 194 (2003) ("*Lenz II*"). The court then remanded Lenz's case to the circuit court for a new sentencing hearing.

The Warden filed a petition for rehearing, which was granted on June 6, 2003. Following additional briefing and argument both on the issues raised in the Warden's petition and on the remaining issues, the court denied Lenz's petition on March 5, 2004. *Lenz v. Warden of the Sussex I State Prison*, 593 S.E.2d 292 (2004) ("*Lenz III*"). Lenz filed a petition for rehearing, which was denied on April 30, 2004.

The Circuit Court of Augusta County scheduled Lenz's execution for July 1, 2004.

- 10 -

B. FEDERAL PROCEEDINGS.

On June 30, 2004, Lenz filed a motion in this court to stay his scheduled execution, a notice of intent to file for a writ of habeas corpus, and a motion to appoint counsel. This court stayed Lenz's execution pending consideration of his federal habeas petition and appointed counsel. In his petition, Lenz sets forth the following eight grounds for federal habeas relief:

I. Lenz was denied his rights under the Sixth, Eighth, and Fourteenth Amendments where jurors were exposed to improper extraneous material during their sentencing phase deliberations;

II. Lenz's right to the effective assistance of counsel under the Sixth Amendment to the United States Constitution was violated when his trial attorneys failed to object to flawed and incomplete verdict forms that did not comport with the jury instructions or the law;

III. Trial counsel's failure to object to the Department of Corrections' unilateral decision to place a stun belt on Lenz throughout his trial, without any showing of need, denied Lenz his rights to be tried without restraint, to effective assistance of counsel, and to a fair trial;

IV. Lenz's right to confront the witnesses against him and to due process of law were violated when the court suppressed evidence about the victim's murder conviction;

V. Lenz was denied his right to counsel at a critical stage of the proceedings due to the trial court's refusal to order that Lenz be transported to a location where he could have reasonable access to his attorneys until a week before his capital trial commenced, and due to the conditions under which the Commonwealth forced

trial counsel to consult with Lenz during the months prior to his trial;

VI.   Counsel rendered ineffective assistance during the sentencing phase;

VII.  Lenz was denied the effective assistance of counsel on direct appeal because counsel failed to preserve, raise and cogently argue meritorious issues; [and]

VIII. The death penalty in Virginia is unconstitutional.

(Pet. at 28-126.)

On November 22, 2004, respondent filed a Rule 5 Answer and Motion to Dismiss. Lenz filed a Response to the Motion to Dismiss on December 23, 2004, the Warden filed a Reply on January 24, 2005, and oral argument was heard on February 10, 2005. Accordingly, the Motion to Dismiss is now ripe for decision.[2]

---

[2]   Lenz has also filed a Motion for Discovery, in which he seeks an order requiring inspection and copying of the files of the state prosecutor and the prison authorities relating to the murder of Brent Parker. Lenz alleges that these files were made available to his trial counsel and believes that they should also be made available to his habeas counsel. A similar motion was filed in Lenz's state habeas proceeding, but was denied. Lenz has no indication that there is anything in the files not already known to him or his habeas counsel, but wants to make sure that his trial counsel did not overlook something. A habeas petitioner is not entitled to discovery unless he or she demonstrates good cause why discovery should be allowed. Rule 6(a), Rules Governing § 2254 Cases. "Good cause is shown if the petitioner makes a specific allegation that shows reason to believe that the petitioner may be able to demonstrate that he is entitled to relief." *Quesinberry v. Taylor*, 162 F.3d 273, 279 (4th Cir. 1998) (citing *Harris v. Nelson*, 394 U.S. 286, 300 (1969)). More specifically, a petitioner must "state what he hoped to find in th[o]se records or how they would help him prosecute his [action]." *Smith v. United States*, 618 F.2d 507, 509 (8th Cir. 1980) (per curiam) (construing similar rule in section 2255 proceeding). Lenz has made no such showing and his request for this discovery will be denied.

- 12 -

### III. PROCEDURALLY DEFAULTED CLAIM.

One claim presented by Lenz in his federal habeas petition was procedurally defaulted during the state court proceedings. A claim is defaulted if: (1) a state court expressly relied on an adequate and independent state procedural rule to deny relief on that claim, *Fisher v. Angelone*, 163 F.3d 835, 844 (4th Cir. 1998); or (2) the petitioner failed to present a claim to the state court and that claim may not now be presented, *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Bassette v. Thompson*, 915 F.2d 932, 936 (4th Cir. 1990).

The Supreme Court of Virginia, in ruling on Lenz's state habeas petition, found that Claim V was procedurally defaulted under the rule in *Slayton v. Parrigan*, 205 S.E.2d 680 (Va. 1974). *Slayton* prohibits state habeas review of claims that were available to the petitioner at trial or on direct appeal but were not raised at that time. *Id*. at 682. The Supreme Court of Virginia's application of the *Slayton* procedural default rule provides an adequate and independent state law ground upon which to deny relief and bars consideration of these claims on federal habeas review, absent cause and actual prejudice or a miscarriage of justice. *See Smith v. Murray*, 477 U.S. 527, 533 (1986); *Burket v. Angelone*, 208 F.3d 172, 188-89 (4th Cir. 2000).

To show cause, a petitioner must demonstrate that "objective factors" external to his defense impeded him from raising his claim at an earlier stage. *Murray v.*

*Carrier*, 477 U.S. 478, 488 (1986). To demonstrate prejudice, a petitioner must show that the alleged constitutional violation worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional magnitude. *Id*. at 492.

In Claim V, Lenz asserts that he was denied his Sixth Amendment right to counsel when the trial court refused to order his transfer to a location where he could have reasonable access to his attorneys until a week before his capital trial commenced. In addition, he claims that the conditions under which the Commonwealth forced trial counsel to consult with him during the months prior to his trial denied him his right to counsel.

On direct appeal, Lenz raised a claim arising from the same set of facts as his current habeas claim. He argued that

> he was "denied effective assistance of [c]ounsel in that the Department of Corrections housed [him] hours away from the site of the trial and of the offices of his appointed attorneys. Because of these great distances the defendant could only meet with his attorneys for a short period of time. The time the defendant spent with his attorneys was much less than the travel time to and from the location."

*Lenz II*, 579 S.E.2d at 198 (quoting *Lenz I*, 544 S.E.2d at 304) (alterations in original)).

The Supreme Court of Virginia refused to consider this claim on direct appeal "because in the Commonwealth, '[c]laims raising ineffective assistance of counsel

- 14 -

must be asserted in a habeas corpus proceeding and are not cognizable on direct appeal.'" *Id*. (quoting *Lenz I*, 544 S.E.2d at 304) (alteration in original)).

In his state habeas petition, Lenz first asserted the claim now before this court, that

> he "was denied his right to counsel at a critical stage of the proceedings due to the trial court's refusal to order that Lenz be transported to a location where he could have reasonable access to his attorneys until a week before his capital trial commenced, and due to the conditions under which the Commonwealth forced trial counsel to consult with Lenz during the months prior to his trial."

*Id*. In its initial habeas opinion, the Supreme Court of Virginia ruled that this claim had been procedurally defaulted "because it could have been raised at trial and on direct appeal," but was not. *Lenz II*, 579 S.E.2d at 198 (citing *Slayton*, 205 S.E.2d at 682). The court distinguished between Lenz's direct appeal and habeas claims:

> [I]n petitioner's petition for a writ of habeas corpus, he does not allege that his counsel were ineffective for this reason. Rather, he asserts that he was denied his rights to counsel at a critical stage of the proceedings, which is different from a claim of ineffective assistance of counsel.

*Id*. Lenz claims there was no state court adjudication of this claim because after issuing its initial opinion, the court "set aside the judgment entered" and "[i]n its subsequent March 5, 2004, opinion . . . did not address this claim." (Pet. at 78.) In its reconsideration opinion, the court unequivocally said, "Petitioner raised ten claims in his petition. . . . In our original opinion we specifically declined to address

- 15 -

petitioner's claims relating to his prior sentencing hearing and *dismissed all his claims except the claim involving the verdict form.*"  *Lenz III*, 593 S.E.2d at 296 n.2 (emphasis added).  The court thus intended its rehearing opinion to supplement, not vacate, its prior holding.  This is further clarified by the opening sentence of the opinion, which explains, "we granted a rehearing to . . . consider whether trial counsel was ineffective because they did not object to the verdict form."  *Id*. at 295.  The court was not required to discuss and dismiss Lenz's right to counsel claim a second time.

Having found that the state court did adjudicate Claim V, I now turn to Lenz's justification for default.  Lenz does not argue that cause and prejudice excuse his procedural default, nor does he claim a miscarriage of justice.  *See  Smith*, 477 U.S. at 533 (outlining the exceptions to procedural default).  Rather, Lenz argues that "[t]he state court incorrectly defaulted this claim based on the clearly erroneous finding that Lenz 'd[id] not allege that his counsel were ineffective.'"  (Pet. at 79 (quoting *Lenz II*, 579 S.E.2d at 198) (alteration in original).)  He asserts that he did, in fact, raise an ineffective assistance of counsel claim in his state habeas petition.[3]  In addition, Lenz

---

[3]  Lenz points out that in Claim V of his state habeas petition, he twice cited *Strickland v. Washington* and "alleged that '[t]he restrictions imposed by the [S]tate . . . prevented Lenz from receiving the effective assistance of counsel,'" and that "'counsels' access to Lenz prior to his trial was so impeded that they were rendered unable to conduct the minimally competent investigation and consultation required by the Sixth Amendment."  (Pet. at 79 (quoting App. 186).)  Lenz states that he also informed the Supreme Court of Virginia by reply brief that he "'may raise a claim of ineffective assistance of counsel for the first time in habeas' and that

- 16 -

argues that *Slayton* does not provide an independent and adequate state bar because it is not "firmly established and regularly followed.'" (Pet.'s Resp. at 19 (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991).)

As previously explained, a federal court may not review a constitutional claim when a state court has declined to consider its merits on the basis of an adequate and independent state procedural rule. *Mu'min v. Pruett*, 125 F.3d 192, 196 (4th Cir. 1997) (citing *Harris v. Reed*, 489 U.S. 255, 262 (1989)). In this case, the Supreme Court of Virginia explicitly relied upon the procedural default rule in *Slayton*. The Fourth Circuit has "held on numerous occasions" that *Slayton* constitutes an adequate and independent state law ground for decision. *Id.* (citations omitted). After determining that a state court relied on an adequate and independent state law ground for its decision, the federal courts "'may only inquire into whether cause and prejudice exist to excuse [a state procedural] default, not into whether the state court properly applied its own law.'" *Fisher v. Angelone*, 163 F.3d 835, 844 (4th Cir. 1998) (quoting *Barnes v. Thompson*, 58 F.3d 971, 974 n. 2 (4th Cir.1995)).

---

'by housing him in a remote location, the [S]tate deprived [Lenz] of the effective assistance of counsel.'" *Id.* (quoting App. 394). Finally, Lenz alleged in his state habeas petition that the Supreme Court of Virginia should have presumed *Strickland* prejudice because his counsel were "functionally absent." *Id.* (citing App. 185).

The Fourth Circuit has applied this rule to a claim almost identical to Lenz's. In *Wright v. Angelone*, 151 F.3d 151 (4th Cir. 1998), the Supreme Court of Virginia held on state habeas review that the petitioner's claim had been defaulted under *Slayton* because it had not been raised on direct appeal. *Wright*, 151 F.3d at 159. The petitioner argued that his claim had, in fact, been raised and ruled upon on direct appeal. *Id*. The Fourth Circuit refused to review this claim, explaining "we are not at liberty to question a state court's application of a state procedural rule because a state court's finding of procedural default is not reviewable if the finding is based upon an adequate and independent state ground." *Id*. (quoting *Williams v. French*, 146 F.3d 203, 208-09 (4th Cir. 1998)).

Because the Supreme Court of Virginia relied upon an adequate and independent state law ground for its decision that Lenz's claim was procedurally defaulted, that decision is not reviewable in this court. Furthermore, because Lenz challenges only the application of the rule in *Slayton*, and offers no argument as to why cause and prejudice or a fundamental miscarriage of justice might excuse his procedural default, I do not consider whether those exist. Accordingly, I find that Claim V is not subject to federal habeas review.

- 18 -

IV. CLAIMS ON THE MERITS.

Lenz raises five claims which the state court adjudicated on the merits. When reviewing such claims, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") states that a federal court may grant habeas relief only if the state court's adjudication resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C.A. § 2254(d)(1), (2) (West 1994 & Supp. 2004).

A state court adjudication is "contrary to" clearly established federal law only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court decision involves an "unreasonable application" of clearly established federal law if the court identifies the governing legal principle, but "unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "It is not enough that a federal habeas court, in its 'independent review of the legal question' is left with a 'firm conviction' that the state court was 'erroneous'. . . . Rather, that application must be objectively unreasonable." *Lockyer*

- 19 -

*v. Andrade*, 538 U.S. 63, 75-76 (2003) (quoting *Andrade v. Attorney Gen. of Cal.*, 270 F.3d 743, 753 (9th Cir. 2001), *overruled on other grounds*, *Lockyer v. Andrade*, 538 U.S. 63 (2003)).

A state court decision is entitled to a "presumption of correctness." 28 U.S.C.A. § 2254(e)(1) (West 1994 & Supp. 2004). That presumption is rebutted only by "clear and convincing" evidence that the state court decision was "based on [an] unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Id.*; *Wiggins v. Smith*, 539 U.S. 510, 528 (2003). The presumption applies equally to the factual findings of state courts that conducted postconviction proceedings. *Howard v. Moore*, 131 F.3d 399, 422 (4th Cir. 1997) (citing *Rushen v. Spain*, 464 U.S. 114 (1983) (per curiam); *Johnson v. Maryland*, 915 F.2d 892, 896 (4th Cir. 1990)).

Even if a writ of habeas corpus is authorized under § 2254(d), a petitioner still is not entitled to relief unless he can show "that any constitutional errors committed 'had substantial and injurious effect or influence on the verdict' rendered by the jury." *Wilson v. Ozmint*, 352 F.3d 847, 855 (4th Cir. 2003) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Fullwood v. Lee*, 290 F.3d 663, 679 (4th Cir.2002) (applying *Brecht* after enactment of the AEDPA)).

- 20 -

### A. CLAIM I—PRESENCE OF A BIBLE
### IN THE JURY ROOM.

Lenz claims that he was denied his rights under the Sixth, Eighth, and Fourteenth Amendments because jurors were exposed to improper extraneous material, the Bible, during their sentencing phase deliberations.

The Supreme Court of Virginia addressed this claim in its state habeas rehearing opinion after reviewing the report of the circuit court judge who conducted an evidentiary hearing on the matter. *See Lenz III*, 593 S.E.2d at 298-300. The court applied the standard for evaluating a claim of extraneous jury contact set forth in *Remmer v. United States*, 347 U.S. 227, 229 (1954). Under *Remmer*, a petitioner is entitled to a presumption of prejudice upon a showing of two elements: (1) that an extraneous contact with or by a member of the jury took place, and (2) that the contact was "about the matter pending before the jury." *Id*.

The Supreme Court of Virginia held that while Lenz had established the first element under *Remmer*, he had failed to establish the second—that the extraneous contact was relevant to the pending matter. *Lenz III*, 593 S.E.2d at 298-99. The court adopted the circuit court's findings that one juror had a Bible, and perhaps a "Woman's Devotional" with her in the jury room, and that several jurors read from it. *Id*. at 299. However, there was no evidence of which Bible passages were read. *Id*.

- 21 -

Therefore, the Supreme Court of Virginia held, there was no evidence that any passages jurors read were related to the sentencing decision, as *Remmer* requires. *Id.*

Lenz argues that the state court's decision on this claim was contrary to or involved an unreasonable application of clearly established federal law, and that it was based on an unreasonable determination of the facts in light of the state court record. Upon review of the record and applicable law, I find that the Supreme Court of Virginia's adjudication was reasonable and deny relief.

First, Lenz argues that the state court unreasonably applied *Remmer* when it required him to establish which passages of the Bible jurors read, rather than merely requiring him to demonstrate "that jurors were exposed to external material that had some relevance to the matter before them." (Pet. at 37.)

A state court adjudication constitutes an "unreasonable application" of clearly established federal law if the court identifies the governing legal principle, but "unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.

Lenz compares the Supreme Court of Virginia's application of *Remmer* to the Fifth Circuit's application of *United States v. Cronic*, 466 U.S. 648 (1984), in *Burdine v. Johnson*, 262 F.3d 336 (5th Cir. 2001) (en banc). In *Cronic*, the Supreme Court suggested in dicta that in some circumstances the performance of counsel might be so

deficient that prejudice may be presumed to have resulted therefrom. *Cronic*, 466 U.S. at 658-60. In *Burdine*, the defendant successfully argued that his counsel's performance was so deficient that the court should presume prejudice. *Burdine*, 262 F.3d at 355-56. Burdine's counsel had slept through portions of the trial, but he could not prove *which* portions. *Id.*

  *Burdine* is not parallel to this case. The *Burdine* court held that *all* events occurring during "the taking of evidence against [the defendant]" occur at a "critical phase." Therefore, the demonstration that counsel slept at *any* time the State was presenting its evidence was sufficient to show that he slept during a "critical stage" of the trial—the showing required for the presumption of prejudice. *Id.* at 355. By analogy, it would have to be true that *all* passages of the Bible read during sentencing deliberations are relevant to the sentencing decision. Therefore, the demonstration that the jurors read *anything* from the Bible during deliberations would be sufficient to show that those passages were relevant to their deliberations. Such a reading would effectively eliminate the relevance prong of *Remmer*. Without a showing of which passages were read, it is impossible to know whether the jurors' search for relevant passages was even successful. I find that the Supreme Court of Virginia did not unreasonably apply *Remmer* when it required Lenz to demonstrate which passages were read.

- 23 -

Furthermore, even if I accepted Lenz's contention that several of the jurors read passages regarding the appropriate punishment for murder, it is impossible to know how that might have affected the sentencing decision without a showing of which passages or books of the Bible were read. The *Remmer* requirement that an extraneous contact be "about the matter pending before the jury" is a prerequisite for a finding of prejudice. *Remmer*, 347 U.S. at 229. Knowing only that "a book" of the Bible was named does not raise any inference of prejudice to the defendant. While passages in some books of the Bible seem to state that the death penalty is the appropriate punishment for murder, those in other books appear to counsel against the death penalty. *Compare Genesis* 9:6 ("Whoso sheddeth man's blood, by man shall his blood be shed. . . ."), *and Exodus* 21:23-25 ("And if any mischief follow, then thou shalt give life for life, [e]ye for eye, tooth for tooth, hand for hand, foot for foot, [b]urning for burning, wound for wound, stripe for stripe."), *and  Leviticus* 24:21 ("[H]e that killeth a man, he shall be put to death."), *with Exodus* 20:13 ("Thou shalt not kill."), *and Matthew* 5:39 ("[W]hosoever shall smite thee on thy right cheek, turn to him the other also."), *and Romans* 12:17, 19 ("Recompense to no man evil for evil. . . . [A]venge not yourselves, but rather give place unto wrath: for it is written, Vengeance is mine; I will repay, saith the Lord."). *See also* Jill Jones, Comment, *The Christian Executioner: Reconciling "An Eye for an Eye" with "Turn the Other*

- 24 -

*Cheek*," 27 Pepp. L. Rev. 127 (1999) (comparing Old and New Testament positions on the death penalty). Even those faiths that use the Bible as their primary text disagree about the Holy Scriptures' teachings on capital punishment. *See* Michigan State University Communication Technology Laboratory and Death Penalty Information Center, *Death Penalty Curricula for High School: Current Issues and Topics: Religion and the Death Penalty* (Nov. 1, 2001), *at* http://teacher.deathpenaltyinfo.msu.edu/c/about/history/history-8.htm (explaining that "Fundamentalist and Pentecostal churches, as well as the Church of Jesus Christ of Latter-day Saints" support the death penalty, while the Roman Catholic Church and certain Protestant denominations oppose it). For these reasons, I find the Supreme Court of Virginia's application of *Remmer* reasonable.

Next, Lenz argues that the Supreme Court of Virginia's decision was based on an unreasonable determination of the facts in light of the state court record. Specifically, Lenz asserts that the court erred by finding first, that the extraneous material was not about the matter pending before the jury, and second, that juror affidavits regarding the reading of that material were not credible.

Lenz first contends that the Supreme Court of Virginia's adjudication was based on an unreasonable determination of the facts because the court incorrectly determined that the extraneous contact, that is, the reading of the Bible, was not about the matter

- 25 -

pending before the jury. Lenz argues that this determination is "absurd" because "[t]he state court based this determination on an *inference*; the state court alleged that *implicit* in the circuit court's finding that there was no evidence of which chapter and verse was read is the determination that 'no evidence showed that jurors read Bible passages relating to the sentencing decision.'" (Pet. at 40 (quoting *Lenz III*, 593 S.E.2d at 299).) Lenz admits "it is true that no juror could identify a specific chapter or verse that was read from the Bible during deliberations," but argues there was clear evidence that several of the jurors read passages regarding the appropriate punishment for murder. (*Id*. at 41.)

I must presume the state court's findings of fact to be correct unless the petitioner makes a clear and convincing showing to the contrary. *Wiggins*, 539 U.S. at 528; § 2254(e)(1). In addition, I must presume correct "inferences fairly deductible from these facts." *Parke v. Raley*, 506 U.S. 20, 36 (1992) (quoting *Marshall v. Lonberger*, 459 U.S. 422, 432 (1983)). There was testimony at the circuit court's evidentiary hearing that at least two jurors asked juror Durrett, who had her Bible with her, whether the Bible indicated the appropriate punishment for murder. (App. 521-23.) Another juror answered that the Bible did provide an answer to the question and identified a book of the Bible, but not a chapter or verse, that discusses the issue. (App. 522-23.) However, there was no evidence of the specific book of the Bible to

- 26 -

which the juror was referring, and there was no evidence that any juror ever stated or read any answer that the Bible provides. (*See* App. 521-26, 532.) These facts distinguish this case from those in which jurors' use of the Bible justified the *Remmer* presumption of prejudice. *Cf. Burch v. Corcoran*, 273 F.3d 577, 590 (4th Cir. 2001) ("[T]he juror 'quoted (from memory and, on occasion by reading) from the Bible'"); *McNair v. Campbell*, 315 F. Supp. 2d 1179, 1183 (M.D. Ala. 2004) (The "foreperson . . . brought a Bible into the jury room, read aloud from it, led the other jurors in prayer, and relied on the Bible to reach his decision"); *People v. Harlan*, 109 P.3d 616, 622 (Colo. 2005) (Finding prejudice under state law corollary to *Remmer* where "[s]everal jurors studied Bibles" during a recess and one took the "Bible in the jury room to share with other jurors the written *Leviticus* and *Romans* texts during deliberations"). The Supreme Court of Virginia's conclusion, albeit an inference, that "no evidence showed that jurors read Bible passages relating to the sentencing decision," *Lenz III*, 593 S.E.2d at 299, is fairly supported by the record and is not unreasonable. I will not deviate from the presumption that that determination is correct.

Lenz also contends that the state court's adjudication was based on an unreasonable determination of the facts because the court incorrectly found that juror affidavits regarding the reading of the Bible in the jury room were not credible. In its

- 27 -

report from the evidentiary hearing, the circuit court indicated that its findings were based on the testimony of the jurors, and not on their prior affidavits.  (App. 713.) The circuit court determined that the juror affidavits were hearsay not falling under any exception to that rule.  (*Id*.)  Noting several problems with the reliability of the affidavits,[4] the court considered them only as they affected the witnesses' credibility. (*Id*.)  The Supreme Court of Virginia found the circuit court's use of the juror affidavits to be an appropriate exercise of that court's discretion.  *Lenz III*, 593 S.E.2d at 297.

Lenz attacks the circuit court's rationale for limiting the use of the affidavits, disputing that they "were 'all hearsay'" and that their value should be discounted

---

[4]  The state hearing judge explained that

all of these Affidavits were taken close to a year and a half after the incident or incidents in questions.  None of the Affiants had the benefit of a transcript, and all of the jurors . . . had some difficulty in recalling precisely what had taken place.  Further, some of these Affidavits . . . were not very specific, and there is no reason for this Court to believe that the jurors, at least, fully appreciated what they were being asked to sign.  There are other obvious problems with some of these Affidavits.  [Juror] Durrette testified with respect to [Lenz's counsel], 'You-all was becoming a little . . . whatever . . . annoying, and I just wanted to get rid of it.'  Another juror . . . testified, again with respect to [Lenz's counsel], 'But I felt like in the first one, I was coerced.'  When asked to explain, she said 'Probably just by prodding, and I felt like words were being put in my mouth.' A lawyer[,] . . . Lenz's trial co-counsel, testified that a portion of an Affidavit he signed was based upon a newspaper article, 'rumor' and information provided by [Lenz's counsel].

(App. 713 (internal citations omitted).)

- 28 -

because they were taken almost a year and a half after the trial. (Pet. at 45-46.) Lenz phrases this argument as an attack on the reasonableness of the state court's factual determinations, not on the circuit court's legal analysis of the hearsay rule and its exception. To the extent that Lenz's argument attacks the court's determination that the juror affidavits were not credible, it is rejected. The credibility of juror testimony is an issue that the trial judge is "uniquely qualified to decide." *Hunt v. Woodson*, 800 F.2d 416, 420 (4th Cir. 1986) (citing *Patton v. Yount*, 467 U.S. 1025, 1038 (1984)). This rule applies equally to credibility determinations of affidavits. *See United States v. Tindle*, 860 F.2d 125, 128 (4th Cir. 1988) (explaining, about an affidavit, "[i]n these matters the trial judge determines issues of credibility").

The circuit court's determination was well-reasoned and supported by the record. The Supreme Court of Virginia was justified in accepting that determination and Lenz has not made the required showing to justify departure from the presumption that the state court's factual findings are correct.

### B. Claim II—Counsel's Failure to Object to the Verdict Forms.

The trial judge presented Lenz's jury with forms containing alternate verdicts and instructed it to select the one reflecting its verdict. (*See* App. 153-54 (verdict forms similar to those used at Lenz's sentencing).) Lenz claims that he was denied his

- 29 -

Sixth Amendment right to the effective assistance of counsel because counsel failed to object to the verdict forms on the grounds that they did not comply with the law and were not consistent with the jury instructions.

The Supreme Court of Virginia first addressed this claim sua sponte on direct appeal. Although neither party raised the issue, the court "asked the litigants to address the verdict form[s] utilized during the penalty phase of the defendant's trial in view of our decision in *Atkins v. Commonwealth*, . . . 510 S.E.2d 445, 457 ([Va.] 1999)." *Lenz I*, 544 S.E.2d at 311. In *Atkins*, the court found a set of verdict forms improper for failing to provide the jury with the option of sentencing the defendant only to a life sentence if it found neither of the two alleged aggravating factors. *Atkins*, 510 S.E.2d at 456. After considering the parties' briefs, the record, and oral argument in this case, the court concluded that any questions related to the verdict forms had been procedurally defaulted because Lenz had neither raised the issue before the circuit court, nor assigned error to the forms on direct appeal. *Lenz I*, 544 S.E.2d at 311.

In his state habeas petition, Lenz claimed, "counsel were ineffective for failing to object to verdict forms which did not comport with the trial court's instructions, Virginia law and federal constitutional requirements." (App. 180.) In its initial habeas opinion, the Supreme Court of Virginia agreed. The court observed that the "life

- 30 -

imprisonment" verdict form used in the sentencing phase of Lenz's trial was "almost identical" to the language then required by Virginia Code section 19.2-264.4(D).  *Lenz II*, 579 S.E.2d at 197.  Nevertheless, the court held that the form did not satisfy the requirements of *Atkins* because it failed to inform the jury that if it found no aggravating factors, it could sentence Lenz to life in prison, or life in prison plus a fine.  *Id*.  The court rejected the Warden's argument that Lenz's counsel could not have been ineffective for failing to object to verdict forms mandated by statute and repeatedly held proper.  It pointed out that Lenz's jury had been instructed one and a half years after the *Atkins* decision.  The court also noted that in *Powell v. Commonwealth*,  552 S.E.2d 344 (2001), which was decided after Lenz's trial, it applied *Atkins* to a set of verdict forms identical to those used in Lenz's trial and found those forms improper.  *Lenz II,* 579 S.E.2d at 197 (citing *Powell*, 552 S.E.2d at 363).  Finally, the court found that the improper verdict forms had prejudiced Lenz, and remanded the case for a new sentencing hearing.  *Id*.

Before a new sentencing hearing could be held, the Warden filed a petition for rehearing with the Supreme Court of Virginia.  The court granted the petition to again consider Lenz's verdict form claim.  The Warden argued that the verdict forms were proper under *Atkins*, that Lenz's counsel could not have anticipated the court's ruling in *Powell* and that counsel, therefore, could not have been ineffective for failing to

object to the forms. *Lenz III*, 593 S.E.2d at 295. This time, the court agreed. *Id.* The court emphasized the difference between the forms used in *Atkins* and at Lenz's trial. The *Atkins* forms failed to provide the option of sentencing the defendant to life when *no* aggravating factor was found; Lenz's forms failed to provide the option of sentencing Lenz to life when *one or both* aggravating factors were found. *Id.* Had Lenz's forms been used at Atkins' trial, the court reasoned, the outcome of *Atkins* would have been different. *Id.* The court further explained that *Powell*, decided after Lenz's trial, was its first opportunity to address the issue Lenz raised. Accordingly, the court held that Lenz's counsel was not ineffective for failing to anticipate a future court ruling. *Id.*

Lenz now asserts two separate ineffective assistance of counsel claims related to the verdict forms: first, that trial counsel failed to object and assign error to the forms on the ground that they did not include the option of sentencing Lenz to life plus a fine of not more than $100,000 (Claim II(A)); and second, that trial counsel failed to object to the forms on the ground that they did not allow the jury to find one or both of the alleged aggravating factors, but still sentence Lenz to life imprisonment or life plus a fine (Claim II(B)). Lenz argues that he raised, but the state court failed to address, Claim II(A), allowing this court to review that claim de novo. Lenz also argues that the state court's decision on Claim II(B) was contrary to and involved an

- 32 -

unreasonable application of clearly established federal law. Upon review of the record and applicable law, I disagree. The Supreme Court of Virginia did adjudicate both Claims II(A) and II(B) on the merits, and its adjudication was reasonable.

First, Lenz contends that he raised Claim II(A) before the Supreme Court of Virginia, arguing that trial counsel were ineffective for failing to object and assign error to the verdict forms on the ground that they did not include the option of sentencing Lenz to life plus a fine of not more than $100,000. However, he asserts, the court failed to address the claim. The respondent disagrees, arguing that Lenz's state habeas Claim IV encompassed both arguments now designated as Claims II(A) and II(B), and that the state court adjudicated both of those on the merits when it decided state habeas Claim IV. Whether or not this claim was "adjudicated on the merits" is a critical question. Absent a decision by the state court resulting from such adjudication, I must review the merits of Claim II(A) de novo. *See* 28 U.S.C.A. § 2254(d); *Weeks v. Angelone*, 176 F.3d 249, 258 (4th Cir. 1999).

In its initial habeas opinion, the Supreme Court of Virginia held that Lenz's verdict forms failed to satisfy the requirements of *Atkins* because "the form[s] failed to inform the jury that it could impose a sentence of life imprisonment *or a sentence of life imprisonment and a fine* if the jury found that neither of the aggravating factors had been proven beyond a reasonable doubt." *Lenz II*, 579 S.E.2d at 197 (emphasis

added).  In the rehearing opinion, the majority framed the issue as "whether the verdict form[s] must specifically provide the option of imposing a sentence of life when the Commonwealth has established one or both aggravating factors."  *Lenz III*, 593 S.E.2d at 295 (emphasis omitted).  However, three justices specifically discussed Claim II(A) in dissent.  They argued that

> the jury in Lenz's case was not given a verdict form that specifically reflected the jury's option of imposing a life sentence, *or a life sentence and a fine of not more than $100,000*, even if the jury found that the Commonwealth had proven beyond a reasonable doubt one or both of the aggravating factors necessary for imposing a sentence of death.  The trial court was required to provide the jury with a verdict form expressly providing this sentencing option, and we expressly so held in *Powell*. . . .

*Id*. at 306 (emphasis added).  The dissent concluded

> any reasonably effective counsel would have recognized after *Atkins* that a [set of] jury form[s] that did not specifically reflect the jury's option of imposing a life sentence, *or a life sentence and a fine of not more than $100,000*, even if the jury found . .  one or both aggravating factors . . ., would not comport with the correct statement of law given to the jury by the trial court in its sentencing instructions.

*Id*.

Section 2254 does not specify the extent to which a state court must discuss a claim in order for that claim to have been adjudicated on the merits.  Indeed, even a summary dismissal of a habeas petition is an "adjudication on the merits" qualifying for § 2254's deferential standard of review.  *Bell v. Jarvis*, 236 F.3d 149, 163 (4th Cir.

- 34 -

2000) (en banc). The state court is not required to offer any rationale for its determination. *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2nd Cir. 2001) (citing *Bell v. Jarvis*, 236 F.3d 149 (4th Cir.2000)); *Weeks*, 176 F.3d at 259 (stating, "[w]here . . . the state supreme court has adjudicated a claim on the merits but has given no indication of how it reached its decision, a federal habeas court must still apply the AEDPA standards of review").

Any failure by the majority to offer an independent rationale for its decision on what is now Claim II(A) does not mean that the Supreme Court of Virginia did not "adjudicate" that claim. The state court's decision on the verdict form issue encompassed both federal Claims II(A) and II(B). This is especially apparent in the rehearing opinion dissent, which specifically mentions the effect the failure to include life plus a fine as a sentencing option had—the verdict forms did not "comport with the . . . sentencing instructions." *Lenz III*, 593 S.E.2d at 305. Moreover, the court's decision to reject Lenz's entire verdict form claim was made for substantive, not procedural reasons, that is, "on the merits." *See Semtek Int'l, Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 497-98 (2001) (noting that the original definition of an "on the merits" adjudication is "one that actually 'pass[es] directly on the substance of [a particular] claim before the court") (quoting Restatement (Second) of Judgments § 19, cmt. a, 161 (1980)). The court did not need to distinguish between the two

- 35 -

claims Lenz now presents separately. Accordingly, I find that the Supreme Court of Virginia's adjudication of state habeas Claim IV did adjudicate on the merits both federal habeas Claim II(A) and II(B) and, therefore, the AEDPA standards of review control.

Next, Lenz argues that if this court finds that Claim II(A) was adjudicated on the merits, as it has, then the state court's adjudication was contrary to and an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984). He makes the same argument as to Claim II(B), as well. Specifically, Lenz contends that the Supreme Court of Virginia failed to identify *Strickland* as the controlling legal authority for both Claims II(A) and II(B), and failed to apply the rule of *Strickland* when resolving those claims. Upon review of the record and applicable law, I find that the Supreme Court of Virginia's adjudication of this claim was reasonable and deny relief.

*Strickland* adopted a two-part standard for evaluating claims of ineffective assistance of counsel, requiring the defendant to show: (1) that "counsel's representation fell below an objective standard of reasonableness," and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). Lenz alleges, "[i]n this case, the Supreme Court of Virginia neither cited to *Strickland* nor

identified the two-prong test . . . [of] *Strickland* as the correct test." (Pet. at 58 (citing *Lenz III*, 593 S.E.2d at 295-96).)

The Supreme Court of Virginia did cite *Strickland* in its first habeas opinion, stating, "[o]ur above-stated holding in *Atkins* requires a finding of prejudice because had counsel assigned error to the verdict form[s] during the direct appeal of the judgment, petitioner would have received a new sentencing proceeding." *Lenz II*, 579 S.E.2d at 197 (citing *Strickland v. Washington*, 466 U.S. at 694). It is true that the court did not cite *Strickland* in connection with the verdict form claim in its reconsideration opinion. Instead, the court cited *Kornahrens v. Evatt*, 66 F.3d 1350 (4th Cir. 1995), for the proposition that trial counsel is not ineffective for failing to anticipate a subsequent court decision. *Lenz III*, 593 S.E.2d at 295 (citing *Kornahrens*, 66 F.3d at 1360). *Kornahrens*, in turn, expressly applied *Strickland*. 66 F.3d at 1360. Citing *Kornahrens* adequately identified the constitutional claim at issue. *See Green v. French*, 143 F.3d 865, 885 n.4 (4th Cir.1998) (holding that a state court has adjudicated a claim on the merits when it relies upon precedent that, in turn, cites to and relies upon the federal precedent at issue), *abrogated on other grounds*, *Williams*, 529 U.S. at 374. The Supreme Court of Virginia's failure to cite *Strickland* does not mean that the court failed to apply the *Strickland* standard.

- 37 -

Lenz also alleges that, if the Supreme Court of Virginia applied *Strickland*, it did so unreasonably. A state court decision constitutes an "unreasonable application" of clearly established federal law if the court identifies the governing legal principle, but "unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. Lenz first argues that the court was required to "determine whether trial counsel's performance was 'reasonable considering all the circumstances'" and suggests the "proper test" would have been "whether trial counsel was 'reasonably effective' under the law that existed at the time of Lenz's trial." (Pet. at 59.)

The performance prong of *Strikland* asks whether "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 694. Although the Supreme Court of Virginia did not specifically mention the phrases Lenz suggests—"reasonable considering all the circumstances" and "reasonably effective"—it did conduct the proper inquiry. It is clear from the court's reconsideration opinion that the court considered all the circumstances surrounding counsel's failure to object to the verdict forms, particularly the fact that *Atkins* had not yet been applied to a case like Lenz's, and that the court weighed that failure against an objective standard of reasonableness. *See Lenz III*, 593 S.E.2d at 295.

Finally, Lenz argues that the court incorrectly relied upon *Kornahrens* in its *Strickland* analysis because *Kornahrens* addresses counsel's failure to anticipate a

- 38 -

"new rule of law," while Lenz's case involved a new application of an existing rule. Although the facts in *Kornahrens* did involve a new rule of law, the Fourth Circuit opinion also discusses "clear precedent" applicable to Lenz's situation. *Kornahrens*, 66 F.3d at 1360 (citing *Honeycutt v. Mahoney*, 698 F.2d 213, 216-17 (4th Cir. 1983) (deciding that trial counsel was not ineffective for failing to object to long-standing North Carolina law even though Supreme Court and First Circuit precedent arguably "foreshadowed" the subsequent overruling of that law)). Lenz's verdict forms complied with statutory requirements.[5] Furthermore, even if *Atkins* did foreshadow *Powell*, *Strickland* does not require counsel to raise "every single conceivable argument." *Ruff v. Armontrout*, 77 F.3d 265, 268 (8th Cir. 1996); *Strickland*, 466 U.S. at 689 (instructing courts reviewing ineffective assistance of counsel claims to

---

[5] Lenz's challenged form stated, "We, the Jury, on the issue joined, having found the defendant guilty of Capital Murder, as charged in the indictment, and having considered the evidence in aggravation and mitigation of the offense, fix his punishment at imprisonment for life." *Lenz II*, 579 S.E.2d at 197. At that time, section 19.2-264.4(D)(2) required an almost identical verdict form: "We, the jury, on the issue joined, having found the defendant guilty of (here set out statutory language of the offense charged) and having considered all of the evidence in aggravation and mitigation of such offense, fix his punishment at imprisonment for life." *See* 2003 Va. Acts chs. 1031, 1040. Not until after Lenz's sentencing and the *Powell* decision was the statute amended as follows: "We, the jury, on the issue joined, having found the defendant guilty of (here set out statutory language of the offense charged) and having considered all of the evidence in aggravation and mitigation of such offense, fix his punishment at (i) imprisonment for life; or (ii) imprisonment for life and a fine of $............" *Id.* (underlining in original); *see also Emmett v. Warden of Sussex I State Prison*, 609 S.E.2d 602, 605 n.6 (Va. 2005) (explaining that the General Assembly amended Code § 19.2-264.4(D)(2) to add the option of a life sentence and a monetary fine after the Supreme Court of Virginia's decision in *Powell*).

- 39 -

"eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time"). Finally, the *Powell* decision was not a foregone conclusion, as Lenz's counsel implies. *See Powell*, 552 S.E.2d at 361-63. The Supreme Court of Virginia recognized that *Powell* presented this issue for the "first time," *Lenz III*, 593 S.E.2d at 295, and in the *Powell* decision itself, the court explained, "this issue is not controlled by *Atkins*." *Powell*, 552 S.E.2d at 363; *cf. Emmett v. Warden of Sussex I State Prison*, 609 S.E.2d 602, 605 (Va. 2005) (finding counsel's performance ineffective for failing to object to a verdict form prior to *Powell* when that form had "*the same omission* as the verdict form at issue in *Atkins*") (emphasis added). I find that the Supreme Court of Virginia reasonably applied *Strickland* to the facts of Lenz's case and reasonably relied upon *Kornahrens* in its analysis.[6]

### C. CLAIM III—COUNSEL'S FAILURE TO OBJECT TO USE OF THE STUN BELT.

Lenz claims that he was denied his right to the effective assistance of counsel because counsel failed to object to the Department of Corrections' decision to place

---

[6] Lenz argues that the failure to object to the verdict form was a "structural error" for which no prejudice under *Strickland* need be shown. The Warden contends that such an argument was not made in the state habeas proceeding. Regardless, the Supreme Court of Virginia reasonably held that the failure of counsel to object was not under the circumstances unreasonable.

a stun belt on Lenz throughout his trial without any showing of need, and in violation of his rights to be tried without restraint, to the effective assistance of counsel and to a fair trial.

The Supreme Court of Virginia first addressed this claim in its initial habeas opinion. The court held that Lenz had failed to establish either the performance or prejudice prongs of *Strickland*. *Lenz II*, 579 S.E.2d at 198. As to the performance prong, the court held that "[e]ven habeas counsel do not dispute that petitioner was a risk to the public if he were able to escape." *Id*. As to the prejudice prong, the court concluded Lenz could not "show that there is a 'reasonable probability' that, but for counsel's [allegedly] unprofessional errors, the result of the proceeding would have been different," especially considering the fact that the jury could not see the belt. *Id*.

Lenz claims there was no "adjudication on the merits" of this claim because after issuing its initial opinion, the court "set aside the judgment entered" and "[i]n its subsequent March 5, 2004, opinion . . . did not address this claim." (Pet. at 67.) As I did in Claim V, I reject this argument because the state court intended its rehearing opinion to supplement, not vacate, its prior holding. The court was not required to discuss and dismiss Lenz's stun belt claim a second time.

Having found that the state court did adjudicate Claim III on its merits, I now turn to Lenz's arguments that the adjudication was contrary to or involved an

- 41 -

unreasonable application of clearly established federal law, and that it was based on an unreasonable determination of the facts in light of the state court record. Upon review of the record and applicable law, I find that the Supreme Court of Virginia's adjudication was reasonable and deny relief.

First, Lenz argues the state court holding that his stun belt claim failed to satisfy either prong of *Strickland* was contrary to the Supreme Court's holdings in *Riggins v. Nevada*, 504 U.S. 127 (1992), and *Holbrook v. Flynn*, 475 U.S. 560 (1986).

In *Riggins*, the Court held that the forced administration of antipsychotic drugs violated a defendant's rights under the Fourteenth Amendment when the defendant was competent to stand trial without the drug. 504 U.S. at 134. Lenz argues that a stun belt can affect a defendant's demeanor and "cognitive processes" just as an antipsychotic drug does. (Pet. at 65.) Therefore, he claims, use of the stun belt prejudiced him and the state court's contrary determination was an unreasonable application of *Riggins*.

In *Holbrook*, the Court applied the rule that the State must demonstrate a compelling interest before engaging in "inherently prejudicial practice[s]," like restraining a defendant during his own trial. 475 U.S. at 568-69 (holding that the deployment of additional courtroom security personnel was not such an "inherently

- 42 -

prejudicial practice"). Because the state court failed to address this argument, Lenz asserts that its adjudication of his stun belt claim was contrary to *Holbrook*.

A state court adjudication is considered "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. Neither *Riggins* nor *Holbrook* involved facts "materially indistinguishable" from those in this case. As already explained, the defendant in *Riggins* was forced to take antipsychotic drugs. 504 U.S. at 134. *Holbrook* involved the deployment of courtroom security officers. 475 U.S. at 568. While there may be parallels between these situations and the use of a stun belt, as Lenz argues, there are also many differences.

*Holbrook* did observe that "shackling and prison clothes . . . unmistakabl[y] separate a defendant from the community at large," making it necessary for the state to justify their use. *Id.* at 569. Again, the use of a stun belt at Lenz's trial is distinguishable—jurors could not see the stun belt, as they could have seen shackles or additional security guards, had they been used. There is no clear precedent for Lenz's proposition that the State must justify the use of any restraint that could possibly impact the defendant's demeanor. The Supreme Court of Virginia's failure

- 43 -

to require the Commonwealth to show a compelling interest before using the stun belt was not an unreasonable application of federal law.

Furthermore, Lenz attacks only those portions of the state court decision related to the prejudice prong of *Strickland*, but the court held that Lenz had failed to satisfy either prong. For this additional reason, Lenz cannot prevail on this claim.

Next, Lenz argues that the state court adjudication resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in state court. Specifically, he contests the state court's findings that "Lenz 'had multiple convictions for escape from custody'" and that "habeas counsel . . . conceded or acknowledged in any way that Lenz would pose 'a risk to the public if he were to escape.'" (Pet. at 69-70 (citing *Lenz II*, 579 S.E.2d at 198).)

I must presume the state court's factual determinations to be correct unless the petitioner presents clear and convincing evidence to the contrary. *Wiggins*, 539 U.S. at 528; § 2254(e)(1). The Supreme Court of Virginia's finding regarding Lenz's "multiple convictions for escape" is consistent with the record. Lenz admits that he

> has *one* conviction for escape from a juvenile facility in 1982, *nearly 20 years before this trial*. Lenz also has one conviction for attempted escape from custody, from 1985, more than 15 years before this trial. The other "escapes" . . . refer to Lenz's unauthorized leaves ("AWOL") from a juvenile facility when he was 16 years old.

- 44 -

(Pet. at 69-70 (internal citations omitted) (emphasis in original).)  This does not meet the clear and convincing standard.

In support of his claim that the state court incorrectly determined "[e]ven habeas counsel do not dispute that petitioner was a risk to the public if he were able to escape," *Lenz II*, 579 S.E.2d at 198, Lenz merely states, "habeas counsel has never conceded or acknowledged in any way that Lenz would pose 'a risk to the public if he were able to escape.'"  (Pet. at 70.)  The Supreme Court of Virginia may have misinterpreted counsel's silence, but any mistake does not rise to the level of an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  *See* 28 U.S.C.A. § 2254(d)(2).  The issue is whether the court's adjudication of the underlying ineffective assistance of counsel claim was based on an unreasonable determination of the facts.  Lenz has failed to present clear and convincing evidence to support such a finding.

Finally, Lenz specifically requests an evidentiary hearing on this claim.  A petitioner may receive an evidentiary hearing if he:  (1) alleges additional facts which, if true, would entitle him to relief and (2) satisfies one of the six factors identified in *Townsend v. Sain*, 372 U.S. 293, 312 (1963).  *Walker v. True*, 401 F.3d 574, 584 (4th

- 45 -

Cir. 2005).[7]  Even if a petitioner can make such a showing, any "'failure to develop the factual basis of a claim' in state court" bars an evidentiary hearing. *Id*. at 584 (quoting 28 U.S.C.A. § 2254(e)(2)).  Lenz is not entitled to an evidentiary hearing because he has not alleged any facts which, if true, would entitle him to relief.

### D.  CLAIM IV—SUPPRESSION OF EVIDENCE ABOUT THE VICTIM'S CRIMINAL HISTORY.

The Commonwealth filed a pretrial motion in limine to suppress evidence about the victim's prior murder conviction, which the trial court granted.  *Lenz I*, 544 S.E.2d at 307.  When Lenz tried to elicit information about Parker's criminal record during the penalty phase of the trial, the Commonwealth objected and the trial court sustained the objection.  *Id*.  Lenz claims that this denied him his rights to confront the witnesses against him and to due process of law.

The Supreme Court of Virginia addressed this claim on direct appeal, holding that Parker's criminal record was not relevant to any issue in the proceeding and

_____

[7]  Those factors are:

(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Walker v. True*, 401 F.3d at 584 n.8 (internal citations omitted).

rejecting Lenz's argument that Va. Code section 19.2-264.4(B) required the circuit court to admit such evidence. *See Lenz I*, 544 S.E.2d at 307. The court also rejected the argument that Lenz had any constitutional right under *Lockett v. Ohio*, 438 U.S. 586 (1978), to present evidence of the victim's criminal history, again emphasizing that the evidence was not relevant. *Id*. at 307-08.

Lenz argues that the state court's adjudication was contrary to and involved an unreasonable application of clearly established federal law as set forth in *Lockett v. Ohio*, 438 U.S. 586 (1978), *Gardner v. Florida*, 430 U.S. 349 (1977), and *Skipper v. South Carolina*, 476 U.S. 1 (1986). Upon review of the record and applicable law, I find that the Supreme Court of Virginia's adjudication was reasonable and deny relief.

First, Lenz asserts that the court's decision was contrary to and an unreasonable application of *Lockett v. Ohio*, 438 U.S. 586 (1978). Lenz summarizes the holding of *Lockett* as "a defendant has an absolute due process right to present evidence about 'any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" (Pet. at 73 (quoting *Lockett*, 438 U.S. at 604).) He contends that Parker's murder conviction, and Lenz's knowledge of that conviction, "are clearly circumstances of the offense that Lenz proffered as a basis for a sentence less than death." *Id*. Lenz argues that the following testimony, which explained the

- 47 -

"ferocity of the attack," *id*. at 70, laid a foundation for the introduction of Parker's

murder conviction:

> Lenz testified that the victim "had threatened me on two different
> occasions. The first time I didn't take seriously at all. I thought he was
> joking. But he told me he was gonna sharpen the point of his cane and
> stab me through the heart with it. He told me that twice. The second
> time I started thinking he was serious, but I didn't—I wasn't sure. And
> the reason I attacked him the way I did was because I was trying to do
> damage to him, without him doing damage to me."

(Pet.'s Opp. to Warden's Mot. Dismiss at 14 (citing App. 39).)

The Supreme Court of Virginia disagreed, specifically holding, "the defendant's

reliance upon *Lockett* . . . is misplaced." *Lenz I*, 544 S.E.2d at 307. The court found

that Parker's criminal history "was not relevant and had no bearing on the defendant's

character, prior record, or the circumstances of the defendant's offense." *Id*. at 308.

The court explained that "'[n]othing [in *Lockett*] . . . limits the traditional authority of

a court to exclude, as irrelevant, evidence not bearing on the defendant's character,

prior record, or circumstances of his offense.'" *Id*. at 307-08 (quoting *Lockett*, 438

U.S. at 605 n.12).

A state court adjudication is considered "contrary to" clearly established federal

law if "the state court arrives at a conclusion opposite to that reached by [the

Supreme] Court on a question of law or if the state court decides a case differently

than [the Supreme] Court has on a set of materially indistinguishable facts," and it

- 48 -

constitutes an "unreasonable application" of clearly established federal law if the court identifies the governing legal principle, but "unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 412-13.

As an initial matter, I must note that the trial court decision reviewed by the Supreme Court of Virginia did not involve an unconditional exclusion of evidence about Parker's criminal history. Rather, the trial court held that the evidence was not relevant at the time Lenz attempted to introduce it. (App. 28-31.) The court instructed Lenz that he could raise the issue of "Parker's disposition" if he first laid the proper foundation.[8] (App. 31.) This is the decision the Supreme Court of Virginia approved when it found the "victim's prior convictions had no relevance to the issue whether the defendant's acts were vile, inhuman, or showed depravity of mind." *Lenz I*, 544 S.E.2d at 307.

---

[8] Trial counsel asked, "he cannot testify about what he knew about Parker when he attacked him?" (App. 29.) The state trial judge answered,

> That isn't . . . what I said . . . You asked me about his conviction. That's what you asked this man about. . . . You . . . put something in there first that's gonna . . . bring in even a hint of self defense in this case, or something like that. And then we can talk about whether you're gonna get into the evidence Mr. Parker's reputation for a turbulent disposition.

(App. 30-31.)

- 49 -

I find nothing unreasonable about the Supreme Court of Virginia's resolution of this claim. The court correctly stated the law, observing that while *Lockett* allows for the introduction of certain mitigating evidence, that grant is limited by the traditional rules of relevancy. *Lockett*, 438 U.S. at 604, n.12; *see also Payne v. Tennessee*, 501 U.S. 808, 827 (1991) (explaining that the State may decide whether "evidence about the victim . . . is relevant"). In addition, the court did not deviate from the Supreme Court "on a set of materially indistinguishable facts" or unreasonably apply the Supreme Court's ruling to the facts of Lenz's case. *Lockett* involved an Ohio statute that limited consideration of mitigating factors to just three specific circumstances. *Id.* at 607. The statute prevented juries from ever hearing evidence about a defendant's "comparatively minor role in the offense . . . or age," *id.* at 608, and prevented Lockett's jury from hearing about "her character, prior record, age, lack of specific intent to cause death, and her relatively minor part in the crime." *Id.* at 597. The evidence Lenz wanted to present is quite different. The state court's decision to approve the trial court's exclusion of that evidence as irrelevant was not unreasonable.

Next, Lenz asserts that the court's decision was contrary to and an unreasonable application of *Gardner v. Florida*, 430 U.S. 349 (1977), and *Skipper v. South Carolina*, 476 U.S. 1 (1986). Lenz cites *Gardner* and *Skipper* for the proposition that "a defendant cannot be sentenced to death on the basis of information

- 50 -

which they had no opportunity to deny or explain," or "that capital murder defendants have a due process right to rebut the Commonwealth's evidence and argument for a death sentence." (Pet. at 73 (citing *Skipper*, 476 U.S. at 5 n.1; *Gardner*, 430 U.S. at 362).) He contends that because the Commonwealth argued the brutality of the murder as an aggravating factor justifying the death penalty, the court's ruling preventing him from denying or explaining that brutality is contrary to *Gardner*, *Skipper*, and *Lockett*.

Lenz's case presents a situation very different than those involved in the cases he cites. As previously explained, the state statute involved in *Lockett* prevented the jury from hearing all but three narrow classes of mitigating evidence. *Lockett*, 438 U.S. at 607. *Gardner* involved a Florida capital sentencing procedure that allowed the trial judge to base a death sentence on confidential information contained in a presentence report, which the defendant was not allowed to see. *Gardner*, 430 U.S. at 353. Finally, in *Skipper* the petitioner had proffered evidence about his good behavior during the time he spent in jail awaiting trial. *Skipper*, 476 U.S. at 4. The Court held that the evidence was admissible because "[c]onsideration of a defendant's past conduct as indicative of his probable future behavior is an inevitable and not undesirable element of criminal sentencing." *Id*. at 5.

- 51 -

Moreover, as a practical matter, the trial court's ruling did not deny Lenz the rights guaranteed by *Gardner*, *Skipper*, and *Lockett*. He was allowed to explain the attack and had the opportunity to deny the Commonwealth's allegations. Lenz testified that he stabbed Parker as many times as he did because he knew him to be a dangerous individual. (Pet.'s Resp. at 14 (citing Direct Appeal App. 831).) At the penalty phase of his trial, Lenz testified that Parker had threatened him and that after he had stabbed Parker a number of times he turned his back, but then attacked Parker again because he thought Parker was reaching for a weapon. (App. 39-40.) Lenz admitted that he feared Parker, that he did not like Parker, that he had intended to kill Parker, and that he had killed Parker for religious reasons. *See Lenz*, S.E.2d at 307-08.

Finally, I reject Lenz's argument that the Commonwealth could portray Parker as a "'helpless' old man" because the jury never heard about his prior murder conviction. (Pet.'s Resp. at 14.) This is an exaggeration. The jury knew that Parker was not a helpless old man—he was an inmate incarcerated at the Augusta Correctional Center. The state court's determination was not contrary to, nor did it involve an unreasonable application of, federal law.

- 52 -

## E. CLAIM VI—COUNSEL'S FAILURE TO PREPARE FOR THE PENALTY PHASE OF TRIAL.

Lenz claims that he was denied his right to the effective assistance of counsel when trial counsel failed to prepare for the penalty phase of trial. Specifically, Lenz alleges that counsel unreasonably failed to: seek additional time to investigate his religion, background, and mental health (Claim VI(A)); investigate and present the circumstances of the offense (Claim VI(B)); investigate and present relevant evidence regarding his religion (Claim VI(C)); investigate and present relevant evidence regarding his background (Claim VI(D)); investigate and present relevant evidence regarding his mental illness (Claim VI(E)); and obtain the assistance of an independent expert (Claim VI(F)). Finally, Lenz claims that he was prejudiced by the cumulative effect of trial counsel's failures (Claim VI(G)). He specifically requests an evidentiary hearing on each of these claims.

Each of Lenz's claims is governed by the standards established in *Strickland v. Washington*, 466 U.S. 668 (1984). As previously explained, to prevail on an ineffective assistance of counsel claim, a petitioner must make a two-pronged showing: first, that counsel's performance was objectively deficient ("performance") and second, that the deficient performance prejudiced him ("prejudice"). *Id*. at 687. To demonstrate the performance prong, the petitioner must show that counsel's acts or

- 53 -

omissions were unreasonable in light of all the circumstances. *Id*. at 688. There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*. at 689. To demonstrate prejudice, the petitioner must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

Having reviewed the record and applicable law, I find that the Supreme Court of Virginia's adjudication of each of Lenz's ineffective assistance of counsel claims was reasonable. Therefore, I deny relief. In addition, I deny his request for an evidentiary hearing on these claims because he has failed to allege any additional facts which, if true, would entitle him to relief.

### 1. Claim VI(A)—Counsel's Failure to Seek Additional Time.

Lenz claims that trial counsel unreasonably failed to seek additional time to investigate all the necessary information regarding Lenz and his background. The Supreme Court of Virginia summarized this claim as follows:

> On April 17, 2000, counsel for petitioner requested a continuance based on difficulties they were experiencing in meeting with petitioner and contacting other potential witnesses. The trial court granted a two-month continuance. Counsel did not seek a second continuance. Petitioner asserts that his counsel should have sought a second continuance because of difficulties in obtaining information and testing regarding petitioner's background.

- 54 -

*Lenz III*, 593 S.E.2d at 300.

In its state habeas rehearing opinion, the Supreme Court of Virginia rejected Lenz's claim, finding, "[t]here is no evidence that any of petitioner's experts told his counsel that they needed more time." *Id*. at 301. Lenz argues that this determination was based on an unreasonable determination of the facts in light of the state court record—"[t]his is false." (Pet. at 84.) He contends that the neuropsychologist informed the mitigation specialist several days before trial that she wished she had been appointed earlier and given more time to examine the evidence and Lenz. *Id*. In turn, he alleges, the mitigation specialist informed counsel of the neuropsychologist's statement and "expressed concern about whether counsel had 'this case in mitigation under [his] belt' or not." *Id*. (citing App. 329.)

I must presume that the Supreme Court of Virginia's determination of the factual issues is correct unless the petitioner makes a clear and convincing showing to the contrary. *Wiggins*, 539 U.S. at 528; § 2254(e)(1). The facts as Lenz states them are not incompatible with the state court's finding. (*See* App. 329-30.) Lenz assumes that the neuropsychologist's statements amount to a request for more time, but presents no evidence that either the neuropsychologist or the mitigation specialist specifically told counsel that she needed more time.

- 55 -

Lenz complains that "[o]nly in the most literal (and meaningless) sense" could the state court's finding be consistent with the experts' statements. (Pet.'s Resp. at 21.) He argues, "[a]dmittedly, the mitigation expert did not use the word 'continuance' in her e-mail to trial counsel; however . . . she made it clear that the neuropsychologist 'needed more time.'" (*Id.* (quoting App. 329)) In fact, no such statement is found in the record. The mitigation specialist reported to counsel that

> [s]he liked Michael a lot and though what had happened in his life was terribly sad, that he had so much to offer if only he'd gotten some real support, especially "mentoring." She seemed truly sorry that she hadn't gotten involved earlier, because she said I was right, it was a lot more complicated than that he was simply anti-social and she believed she could have developed a lot more with time.

(App. 329.) The mitigation specialist then wrote, "If you don't feel like you have this case in mitigation well under your belt, we could still get together one night. . . . If Denise can't be part of that, you could come here and we can continue to talk it though until it's like second nature to you." (*Id.*) The difference between the experts' statements regarding their preparedness for trial and Lenz's interpretation of those statements is far greater than the difference between the words "continuance" and "needed more time." When read in its entirety, the e-mail simply expresses the common pretrial feeling that more could be done with more time.

- 56 -

Furthermore, Lenz's counsel did ask for, and received, one continuance in this case. The neuropsychologist was able to complete her evaluation in that amount of time and competently presented the results of that evaluation to the mitigation specialist who, in turn, affirmed counsel's mitigation strategy. *Cf. Fisher v. Lee*, 215 F.3d 438, 452 (4th Cir. 2000) (rejecting claim that counsel was ineffective for presenting insufficiently prepared expert testimony where the expert evaluated the defendant, testified comprehensively at trial, never told trial counsel that he felt unprepared or uncomfortable with his testimony, and later stood by the opinions that he had offered at trial). The Supreme Court of Virginia's determination is in no way unreasonable in light of the evidence presented in the state court proceeding.

### 2. CLAIM VI(B)—EVIDENCE REGARDING THE CIRCUMSTANCES OF THE OFFENSE.

Lenz claims that trial counsel unreasonably failed to investigate and present certain circumstances of the offense, namely: that Lenz knew the victim, Parker, was in prison for murder; that Parker had threatened Lenz; that Parker practiced magic; and that Lenz believed in and feared curses and spells. He argues that such evidence could have been introduced in mitigation of the offense and to rebut the Commonwealth's evidence of vileness.

- 57 -

The Supreme Court of Virginia addressed this claim in its state habeas rehearing opinion. *Lenz III*, 593 S.E.2d at 301. First, the court found that Lenz himself had testified about "the nature of the Asatru religion and his dedication to it as well as his relationship with the victim and the threats the victim made toward him." *Id*. Second, the court held that even if the evidence could have rebutted the "depravity of mind" ground for the vileness aggravating factor, it did not address the alternate grounds—torture and aggravated battery. *Id*. The evidence that the victim was stabbed sixty-eight times was sufficient to support a finding of either of those remaining components. *Id*. Finally, the court pointed out, the jury also found that Lenz would be a future danger to society—another aggravating factor.[9] *Id*. "Nothing in the alleged missing testimony," the court reasoned, "would have affected that finding." *Id*. The court concluded that Lenz had failed to demonstrate the prejudice prong of *Strickland*. *Id*. (citing *Strickland*, 466 U.S. at 694). He could not

_____

[9] Virginia's capital punishment statute requires the jury to make a two-stage determination:

> The jury first decides whether the prosecutor has established one or both of the statutory aggravating factors. Va. Code Ann. §§ 19.2-264.4(C)-(D) ([Michie] 1995). If the jury finds neither aggravator satisfied, it must impose a sentence of life imprisonment. *Id*. If the jury find one or both of the aggravators established, however, it has full discretion to impose either a death sentence or a sentence of life imprisonment. *Id*.

*Tuggle v. Netherland*, 516 U.S. 10, 12 (1995).

demonstrate that, had the additional evidence been presented to the jury, there would have been a reasonable probability of a different result. *Id.*

Lenz argues that the state court adjudication involved an unreasonable application of clearly established federal law. He contends that the Supreme Court of Virginia unreasonably applied *Williams v. Taylor*, 529 U.S. 362 (2000), and *Tuggle v. Netherland*, 516 U.S. 10 (1995) (per curiam), when it required him to "offer evidence capable of rebutting all aggravating factors." (Pet. at 88.) He argues that the Supreme Court "repeatedly has made clear that a petitioner need not demonstrate death *ineligibility* in order to prove he suffered prejudice as a result of the failure to present particular sentencing phase evidence." (*Id.*) Upon review of the record and applicable law, I find that the Supreme Court of Virginia's adjudication was reasonable and deny relief.

A state court adjudication is an "unreasonable application" of clearly established federal law if the court identifies the governing legal principle, but "unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.

First, Lenz claims that the Supreme Court of Virginia unreasonably applied *Williams*. In *Williams*, the Supreme Court held that when determining the prejudicial effect of a failure to present mitigating evidence, a court must consider the totality of that evidence, rather than focus on whether the evidence was capable of supporting

- 59 -

or rebutting particular aggravating factors. 529 U.S. at 397-98. The *Williams* jury found the aggravator of future dangerousness but, due to counsel's ineffectiveness, never heard evidence about the defendant's possible mental retardation or his "nightmarish childhood." *Id*. at 398. The Court stated, "[m]itigating evidence unrelated to [an aggravating factor] may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." *Id*. The proper analysis, therefore, is to "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—in reweighing it against the evidence in aggravation." *Id*. at 397-98.

This is the exact type of analysis the Supreme Court of Virginia performed in Lenz's case. The court added the omitted evidence to all of the mitigating evidence presented at the penalty stage, and then weighed the resulting total against all of the aggravating circumstance evidence to determine whether the additional evidence created a reasonable probability of a different result. Having conducted that analysis, the court concluded that Lenz was not prejudiced. This conclusion was not objectively unreasonable.

Furthermore, the mitigating evidence at issue was not wholly unpresented. The jury heard about the evidence from several witnesses, including Lenz himself. A psychologist testified that Lenz murdered the victim "based 'solely on a religious

conviction.'" *Lenz III*, 593 S.E.2d at 302-03. Two officers testified that Lenz had

never caused them any problems at the prison. *Id.* at 303. Lenz testified "about the

nature of the Asatru religion and his dedication to it as well as his relationship with the

victim and the threats the victim made toward him." *Id.* at 301. In addition, this was

not a case where the weight of the aggravating circumstances, or the evidence

supporting them, was weak. The jury heard Lenz describe how he "called [the victim]

up to the altar" and stabbed him sixty-eight times. *Lenz I*, 544 S.E.2d at 299, 303.

The jury listened to the Chief Medical Examiner describe how the victim remained alive

during the entire attack. *Id*. at 302.

Lenz argues that "mitigating evidence has value independent of its effect on

aggravating evidence." (Pet. at 91.) That is true. However, the effect on this case is

much less than in *Williams*. In *Williams*, the State established only one aggravating

circumstance and the defense both failed to present mitigating evidence to rebut that

circumstance, and failed to present additional mitigating factors. *See* 529 U.S. at 370-

71. Here, the Commonwealth established both aggravating circumstances, one on

several grounds, and the mitigating evidence the defense failed to present rebutted only

one of those grounds and provided no additional mitigating factors. In short, the

evidence on the record does not undermine confidence in the outcome of the

proceedings. *See Strickland*, 466 U.S. at 694; *see also Williams*, 529 U.S. at 391.

- 61 -

The Supreme Court of Virginia did not unreasonable apply *Williams* to the facts of this case.

Next, Lenz claims that the Supreme Court of Virginia unreasonably applied *Tuggle v. Netherland*, 516 U.S. 10 (1995) (per curiam). Lenz cites *Tuggle* for the proposition that a petitioner not need demonstrate that an alleged constitutional error invalidated *all* the aggravating factors in a case in order to demonstrate prejudice. (Pet. at 88 (citing *Tuggle*, 516 U.S. at 14).) He asserts that the Supreme Court of Virginia required him to demonstrate the invalidity of both aggravating factors in his case.

The Supreme Court of Virginia addressed this claim in its rehearing opinion. It did not require Lenz to demonstrate the invalidity of both aggravating factors, as Lenz alleges, but instead held that Lenz had failed to invalidate even one aggravating factor. *Lenz III*, 593 S.E.2d at 301. The court explained,

> [p]etitioner . . . asserts that the inmate's testimony would have shown that the killing was not related to petitioner's depravity of mind, one of the grounds for establishing the vileness factor. However, this assertion does not address the other grounds supporting a finding of vileness. . . . Furthermore, the jury also found that petitioner would be a future danger to society. Nothing in the alleged missing testimony would have affected that finding.

*Id.*

- 62 -

Even assuming that Lenz's mitigation evidence would have completely invalidated the vileness factor, the court's holding still was reasonable under *Tuggle*. Lenz fails to describe in his petition the circumstances under which the *Tuggle* court recognized that a conviction can be upheld after an aggravator has been invalidated. A death sentence does not need to be set aside where, even after elimination of the invalid aggravator, "unimpeachable aggravating factors remain[]." *Tuggle*, 516 U.S. at 13 (citing *Zant v. Stephens*, 462 U.S. 862, 885-86 (1983)); *see also Tuggle v. Netherland*, 79 F.3d 1386, 1393 (4th Cir. 1996) (applying six factors to determine whether an invalid aggravating circumstance has a substantial and injurious effect or influence on the jury's verdict). Thus, when constitutional error renders one aggravating circumstance invalid, the existence of another aggravating circumstance may or may not require the death penalty to be set aside.

As previously discussed, the remaining aggravating evidence in Lenz's case was overwhelming. Any failure on counsel's part would not create a reasonable probability of a different result. The Supreme Court of Virginia's conclusion that Lenz could not demonstrate prejudice from his counsel's failure to present the mitigating evidence at issue was not an unreasonable application of *Williams*.

- 63 -

### 3. Claim VI(C)—Evidence Regarding Lenz's Religion.

Lenz claims that trial counsel unreasonably failed to investigate and present relevant evidence regarding his religion, Asatru. Lenz claims he was the only witness to describe Asatru. Without additional evidence about the religion and prison life in general from Lenz's fellow inmates or from a prison expert, "the jury was left to speculate about Lenz's religion and its significance in this case." (Pet. at 93.) As Lenz argued before the Supreme Court of Virginia, the jury was left with the "sole impression that Lenz's religion was nothing more than a dangerous and scary cult." *Lenz III*, 593 S.E.2d at 301.

The Supreme Court of Virginia rejected this claim in its state habeas rehearing opinion. *Id.* First, the court addressed counsel's alleged failure to call James E. Aiken, a prison life expert, to testify about Lenz's religion. The court held, "[n]othing in the record suggests that . . . Aiken had any knowledge of the Asatru religion or of petitioner's involvement in it. The record shows only that Aiken had qualified as an expert in 'prison operations and classifications' and would have testified regarding the probability of petitioner's future dangerousness." *Id.*

Next, the court reviewed the testimony given at trial. Lenz called the prison psychologist who interviewed him after the murder, Martin Rogozinski. Rogozinski

- 64 -

"described some of the tenets of the Asatru religion . . . [and] testified that he believed petitioner was sincere in his dedication to the religion." *Id.* Counsel began to elicit evidence from Rogozinski about prison life and the role religion plays in it. However, the court found that counsel made a strategic decision to end that line of questioning when Rogozinski indicated that no violence had been associated with the Asatru religion and the trial judge barred further inquiry into violent acts by other prison religious groups. *Id.* at 301-02.

Finally, the court addressed Lenz's allegation that counsel were ineffective for failing to call other prison inmates to testify about prison life and Asatru. The court determined that the proposed testimony "did not involve the substance of the Asatru religion . . . [but] described the contrast between petitioner's immersion in his religion and the victim's aggressive, bullying, non-religious character, as well as the relationship between petitioner and his victim." *Id.* at 302. Because Lenz and others had testified about these very same facts, the court rejected this argument.

The Supreme Court of Virginia concluded that Lenz had failed to demonstrate either prong of *Strickland*. Counsel did not "act unreasonably in light of all the circumstances" and the failure to present testimony from Aiken or other inmates did not "raise[] a reasonable probability that the result of the sentencing proceeding would have been different." *Id.* (citing *Strickland*, 466 U.S. at 689.)

- 65 -

Lenz argues that the state court's adjudication of this claim resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Specifically, he attacks three of the state court's determinations: (1) prison expert James E. Aiken had no knowledge of the Asatru religion or of Lenz's involvement in it; (2) trial counsel attempted to put on evidence about prison life and religious groups through prison psychologist Martin Rogozinski, but ceased the line of questioning for strategic reasons; and (3) the proffered inmate testimony did not involve the substance of Asatru, but was merely duplicative of Lenz's own testimony. Upon review of the record and applicable law, I find that the Supreme Court of Virginia's adjudication was reasonable and deny relief.

I must presume the state court's findings of fact to be correct unless the petitioner makes a clear and convincing showing to the contrary. *Wiggins*, 539 U.S. at 528; § 2254(e)(1). Lenz first alleges the state court's determination was based on an unreasonable determination of the facts because, contrary to the state court's finding, James E. Aiken did have knowledge of the Asatru religion and Lenz's involvement in it. Lenz asserts that the state court finding was false, and that the opposite was true, but offers no explanation or supporting evidence. In his reply brief Lenz argues that he "need not demonstrate that every factual determination made by

- 66 -

the state court was unreasonable . . . [and that he] has shown that some of the facts upon which the state court based its decision were incorrect or unreasonable." (Pet.'s Resp. at 22.) While this may be true, it does not justify my departure from the state court's finding on this particular argument. In light of Lenz's failure to present any specific arguments as to why this finding by the court is incorrect or unreasonable, I must presume that it is correct.

Next, Lenz argues that the state court's determination related to the testimony of prison psychologist Martin Rogozinski was based on an unreasonable determination of the facts for two reasons: (1) because there was no evidence that counsel decided to stop questioning Rogozinski for strategic reasons; and (2) because trial counsel did not try to introduce evidence about Asatru and Lenz's belief in it through Rogozinski. Lenz states that the only available evidence related to counsel's decision to stop questioning Rogozinski is their joint affidavit and "[n]owhere in that affidavit do trial counsel suggest that they had a strategic reason for abandoning questioning pertaining [to] the tenets of the Asatru religion and Lenz's sincere beliefs in the religion." (Pet. at 97 (citing App. 223-26).) *Strickland v. Washington*, 466 U.S. 668 (1984), requires courts to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered

- 67 -

sound trial strategy.'" *Strickland*, 466 U.S. at 288-89 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). It also urges courts to make every possible effort to "eliminate the distorting effects of hindsight." *Id*.

Lenz cites trial counsel's affidavit as evidence that counsel had no strategic reason for stopping their questioning of Rogozinski. However, the affidavit does not discuss Rogozinski at all, much less contradict the Supreme Court of Virginia's finding. (*See* App. 223-26.) Nor does the trial transcript contradict the court's conclusion. (*See* App. 17-24; 25-26.) There are many conceivable strategic justifications for counsel's decision to forego additional questioning. The Supreme Court of Virginia described two possibilities: Rogozinski indicated a lack of violence associated with the Asatru group, and the trial judge barred questions about violence in other religious groups. *Lenz III*, 593 S.E.2d at 301-02. In general, Rogozinski was not a strong defense witness—the Commonwealth actually introduced his statement into evidence as one of its own exhibits. (App. 25.) Considering the *Strickland* standard, it was well within the state court's authority to determine that the decision to stop questioning Rogozinski was a strategic one and Lenz has not presented clear and convincing evidence to justify my departure from the presumption that the state court's finding was correct.

- 68 -

Lenz also contends that the state court incorrectly determined that trial counsel tried to introduce evidence about Asatru and Lenz's belief in it through Rogozinski. He argues that that determination was "pure speculation . . . inconsistent with the record and unsupported by trial counsels' affidavit." (Pet. at 98.) Lenz misstates the Supreme Court of Virginia's finding. The court did not find that "trial counsel attempted, or even intended, to use Rogozinski as a vehicle for conveying information about 'the *substance of the Asatru religion*' and 'the *sincerity of petitioner's religious beliefs*.'" (Pet. at 98 (emphasis added).) Rather, the court found that "trial counsel did attempt to put on the *dynamics of the prison atmosphere and religious groups* through the prison psychologist." *Lenz III*, 593 S.E.2d at 301-02 (emphasis added). There is no basis for me to depart from the presumption that the state court's factual finding was correct.

Finally, Lenz argues the state court's determination that inmate testimony would have been duplicative of Lenz's and Rogozinski's testimony was based on an unreasonable determination of the facts. Lenz asserts that "the inmates who were available to testify could have offered unique insight into the basic tenets of Asatru, into the dynamics of the particular Asatru group to which Lenz and the victim belonged, and into the sincerity and intensity of Lenz's religious convictions." (Pet. at 98 (citing Affs. of Edwin Denette, Carl Johnson, and Thomas Pitts).) To the extent

- 69 -

that the inmate testimony would have been duplicative, Lenz argues it would have bolstered Lenz's credibility.

Courts are reluctant to find ineffective assistance based upon complaints regarding uncalled witnesses. *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). The decision to present a particular witness' testimony is essentially one of strategy within trial counsel's domain, *id*., and is entitled to a presumption in counsel's favor under *Strickland*, 466 U.S. at 288-89.

As an initial matter, review of the inmate affidavits shows that while they do describe the dynamics of the particular Asatru group to which Lenz and Parker belonged and Lenz's devotion to Asatru beliefs, they do not describe any of the tenets of the religion. (*See* App. 230-35.) There is no evidence in the record to contest the Supreme Court of Virginia's finding that the inmate testimony "did not involve the substance of the Asatru religion." *Lenz III*, 593 S.E.2d at 302.

Review of the inmates' affidavits also reveals that their testimony would, for the most part, have been cumulative to the testimony of Lenz and Rogozinski. In his testimony, Lenz described an Asatru ceremony. (App. 32-34.) He talked about the history of the Asatru group at the prison, including the power struggle he and Parker had engaged in since the group's formation. (App. 28, 35-36.) He testified, "I was the religious leader of that group for a while. I was appointed . . . [and] voted that. . . .

- 70 -

And I was constantly getting—getting conflict from—from Brent Parker. . . ."  (App. 36.)  Both Lenz and Parker were founding members of the Asatru group and, at the time of the murder, were the only two original members remaining.  (App. 28, 35.)  Lenz also described his belief that Parker was insincere in his practice of Asatru, stating, "I didn't like the way that he dishonored the performance of the religious ceremonies.  I didn't like the way that he disrespected those—those forces that I called God."  (App. 28, 34.)  In addition, Lenz professed his belief in magic and testified that Parker had cast spells against him.  (App. 37.)

Rogozinski testified that Lenz had "revealed himself as a true or authentic believer" in Asatru.  (App. 20.)  He described the relationship between Lenz and Parker as being in a state of "long-term conflict."  (*Id*.)  He repeated Lenz's allegations that Parker "was a despict [sic]; he wasn't a true Asatru" and that "his followers were 'lost in the sauce,'" meaning "Mr. Parker was leading but his doctrine was off base." (*Id*.)  Rogozinski also repeated Lenz's belief that "Mr. Parker's motives were to gain a following; not to be a true believer.  Mr. Lenz considered Mr. Parker's behavior as dishonorable and untrue to himself."  (App. 20-21.)  Rogozinski testified that when he asked Lenz whether Parker's murder was "a result of dishonor," Lenz had agreed. (App. 21.)  Rogozinski testified, "I am convinced Mr. Lenz's actions against Mr. Parker were based solely on a religious conviction."  (App. 22.)

The inmates whose testimony Lenz claims should have been offered would have added little new information. Edwin Denette would have testified that in 1996 or 1997 Parker was the leader of the Asatru group and Lenz was a member, that Parker was aggressive, and that there was "a lot of hostility" in the group, though it was primarily between Parker and another inmate, not Lenz. (App. 230.) Carl Johnson would have testified that Lenz was quiet and non-violent, while Parker was aggressive, and that Parker wanted to control the Asatru group. (App. 231.) He would have testified that while Lenz was "completely devoted to Asatru," Parker was not "particularly devoted," and there was tension between the two. (App. 231-32.) Johnson would have described Lenz's "complete[] devot[ion]" to Asatru, his seeming preoccupation with "wizards and fairies," and some strange behavior he had observed in Lenz, including a time that Lenz was talking about a vision no one else could see. (App. 231.) Pitts would have testified that Parker took control of the group in 1996, that Lenz was "completely submersed" in his religion, including a belief in curses, and that while Lenz was "easy to get along with," Parker was "loud and always seemed to get on people's nerves." (App. 233.)

The Supreme Court of Virginia correctly summarized the inmate testimony as describing "the contrast between petitioner's immersion in his religion and the victim's aggressive, bullying, non-religious character, as well as the relationship between

- 72 -

petitioner and his victim." *Lenz III*, 593 S.E.2d at 302. The court's finding that the testimony had already been presented through other witnesses was not unreasonable.

Lenz's final argument as to the inmate testimony is that even if it were duplicative, it should have been admitted because it would have bolstered his credibility. To the extent that this raises the new argument that the state court's determination resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law, it is rejected. In any event, even if this court were to conclude that counsel should have introduced the inmate testimony, Lenz still would not be entitled to relief because that testimony was not so critical, viewed in the context of the other evidence, to have had any probability of changing the outcome of the jury's verdict. *See Fisher v. Lee*, 215 F.3d 438, 452-53 (4th Cir. 2000) (denying ineffective assistance of counsel claim where the evidence counsel failed to present was cumulative). Lenz has failed to present clear and convincing evidence to justify my departure from the presumption that the Supreme Court of Virginia's factual determinations are correct.

### 4. CLAIM VI(D)—EVIDENCE REGARDING LENZ'S BACKGROUND.

Lenz claims that trial counsel unreasonably failed to investigate and present relevant evidence regarding his background. Specifically, Lenz alleges that counsel

were ineffective for failing to investigate and present testimony from his family members about their family history of alcoholism, drug abuse, and mental illness, and for failing to present evidence from Lenz's psychiatric and other institutional records.

The Supreme Court of Virginia discussed this claim in its state habeas rehearing opinion. *Lenz III*, 593 S.E.2d at 302-04. First, the court addressed Lenz's contention that counsel were ineffective for failing to investigate and present information about his family history of alcoholism, drug abuse, and mental illness. *Lenz III*, 593 S.E.2d at 302. The court described counsel's efforts to locate Lenz's biological father and other paternal family members, but noted that those efforts were unsuccessful. *Id*. The court concluded, "we cannot say that counsel's actions 'fell below an objective standard of reasonableness.'" *Id*. (quoting *Strickland*, 466 U.S. at 688). In addition, the court found that Lenz had "failed to show what the jury could have heard that would have had a reasonable probability of changing the sentencing result." *Id*. at 304.

Next, the court addressed Lenz's allegation that counsel were ineffective for failing to present evidence about Lenz's "psychiatric institutionalizations, diagnoses, and treatments." *Id*. The court described in some detail the testimony counsel did present to the jury—that of Lenz's mother.[10] From this testimony, the jury learned

_____

[10] Lenz's mother testified about her divorce from Lenz's biological father and remarriage to Bill Lenz, an "intense" and "strict" father. She also described how the family moved a number of times as Bill Lenz, a Navy pilot, was given new station assignments. In the

- 74 -

about Lenz's "unloving and demanding step-father, his natural father's drinking problem, his suicidal tendencies, his low self-esteem and feelings of worthlessness, and his own extensive drug and alcohol use." *Id*. at 304.

The court then considered the evidence counsel did not present, noting that Lenz's test scores and psychological evaluations contained mixed information. On the one hand, they showed that Lenz was intelligent, but on the other, showed that he was impulsive and destructive, and abused drugs and alcohol. "In light of the information contained in the reports," the court concluded, "counsel's decision not to present more detail regarding those reports was not unreasonable. The particulars of those reports would have represented a 'two[-]edged sword' that counsel often confront when constructing the strategy most likely to assist rather than harm a client." *Id*. at 303. Finally, the court held that Lenz had failed to demonstrate anything that would have had a reasonable probability of changing the result of his sentencing.

---

fourth grade, Lenz was sent to a special day school because he had trouble controlling his anger, but he attended public school again the next year. At fourteen, Lenz was admitted to a psychiatric treatment center because he had threatened to kill himself after taking a neighbor's car without permission. A few months after his release, he was again admitted to a psychiatric hospital after burglarizing a home and stealing some jewelry. Lenz's family participated in his counseling at each of these institutions. Lenz eventually earned his general equivalency degree and he enrolled in college, but dropped out after being sent to jail. *Lenz III*, 593 S.E.2d at 302-03.

Lenz argues that the Supreme Court of Virginia's decision was contrary to and an unreasonable application of clearly established federal law, and that it was based on an unreasonable determination of the facts in light of the state court record. Upon review of the record and applicable law, I find that the Supreme Court of Virginia's adjudication was reasonable and deny relief.

First, Lenz argues that the state court decision is both contrary to and an unreasonable application of clearly established federal law set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and *Wiggins v. Smith*, 539 U.S. 510 (2003). The alleged errors include the state court's failure to "inquire whether counsel's performance fell short of professional standards," its focus "on the evidence trial counsel *did* present, rather than the evidence counsel failed to present," and its failure "to consider the totality of the evidence." (Pet. at 103.)

A state court adjudication is considered "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts," and it constitutes an "unreasonable application" of clearly established federal law if the court identifies the governing legal principle, but "unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 412-13.

- 76 -

Lenz first challenges the Supreme Court of Virginia's conclusion as to the performance prong of *Strickland*. He argues that the court failed to "inquire whether counsel's performance fell short of professional standards." (Pet. at 103.) *Strickland* requires courts evaluating ineffective assistance of counsel claims to measure the performance of the attorney in question against an objective standard of reasonableness, that is, "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. *Wiggins* reiterates this standard. 539 U.S. at 521-22. This reasonableness determination must be made "in light of all the circumstances," meaning that the reviewing court must consider the circumstances as they existed at the time of the representation. *Strickland*, 466 U.S. at 687-88, 90. The court must be highly deferential to counsel's performance because there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689.

When determining whether trial counsel were ineffective for failing to investigate and present evidence about Lenz's family history of alcoholism, drug abuse, and mental illness, the Supreme Court of Virginia found that trial counsel's efforts to locate family members were sufficient, albeit unsuccessful. *Lenz III*, 593 S.E.2d at 302. The court concluded "[u]nder the circumstances, we cannot say that counsel's actions 'fell below an objective standard of reasonableness.'" *Id*. (citing

- 77 -

*Strickland*, 466 U.S. at 688).  Although the court did not discuss specific professional standards, it did specifically conclude that counsel's performance was objectively reasonable under the circumstances.  Further, this conclusion is consistent with *Strickland's* declaration that "thorough investigation[s]" are "virtually unchallengeable."  466 U.S. at 690-91.

When determining whether counsel were ineffective for failing to present detailed information about Lenz's institutionalizations, diagnoses, and treatments, the Supreme Court of Virginia again conducted the proper analysis.  The court found that, in light of the information contained in the institutional reports and evaluations counsel had obtained, "counsel's decision not to present more detail regarding those reports was not unreasonable" because the particulars of those reports represented a "two[-]edged sword."  *Id*. at 303 (citing *Barnes v. Thompson*, 58 F.3d 971, 980-81 (4th Cir. 1995)). Contrary to Lenz's contention, the court did apply the correct standard and its decision was supported by the proper authority.  The court reviewed Mrs. Lenz's testimony and summarized the information counsel failed to present.  *Lenz III*, 593 S.E.2d at 302-04.  The court concluded that counsel's decision was the product of a sound trial strategy, as must be presumed under *Strickland*.  466 U.S. at 689.  In addition, the court supported its conclusion with authority, *Barnes v. Thompson*, 58 F.3d 971 (4th Cir. 1995), which describes how courts should apply the performance

- 78 -

prong of *Strickland*, and how strategic choices by counsel should be treated under that standard. *Barnes*, 58 F.3d at 980-81.

Lenz next challenges the Supreme Court of Virginia's conclusion as to the prejudice prong of *Strickland*. He argues that the court incorrectly focused "on the evidence trial counsel *did* present, rather than the evidence counsel failed to present," and failed "to consider the totality of the evidence." (Pet. at 103.) When making the prejudice determination, a court must "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Williams*, 529 U.S. at 397-98 (citing *Clemons v. Mississippi*, 494 U.S. 738, 751-752 (1990)); *see also Wiggins*, 539 U.S. at 536.

When determining whether Lenz was prejudiced by counsel's alleged errors, the Supreme Court of Virginia addressed Lenz's claims relating to his family history and his institutional records together. The court considered not only what counsel *did* present, but also what information counsel failed to present. As previously explained, the court reviewed Mrs. Lenz's testimony, which included information about Lenz's family history and institutionalizations, and it summarized the information contained in the reports that counsel failed to present. *Lenz III*, 593 S.E.2d at 302-04. The court concluded, "petitioner has failed to show what the jury could have heard that would

- 79 -

have had a reasonable probability of changing the sentencing result." *Lenz III*, 593 S.E.2d at 303.  It is apparent from the court's opinion that it considered the totality of the evidence—the evidence presented at trial and that counsel failed to present.

In addition, Lenz argues that the state court incorrectly "discounted the value of the omitted evidence by finding that some of the unpresented evidence contained harmful rather than helpful information about Lenz." (Pet. at 104.)  He asserts that the state court should have found counsel ineffective for failing to present all available mitigation evidence, even though some of that evidence was unfavorable.  *Williams* specifically instructs courts to "reweigh" the mitigating and aggravating evidence.  529 U.S. at 397-98; *see also Clemons v. Mississippi,* 494 U.S. 738, 754 (1990) (finding reweighing by state courts constitutionally permissible).  Considering whether some of that mitigating evidence could be harmful to the petitioner is a proper component of that reweighing.  *See Lovitt v. True*, 2005 WL 767416, *9 (4th Cir. Apr. 6, 2005) (approving the Supreme Court of Virginia's reweighing in a case where the court concluded that "presenting evidence of [the petitioner's] social history to the jury and drawing attention to this can of worms would have actually hurt [petitioner's] case, rather than helped it").  The state court did not unreasonably apply clearly established federal law when it factored into its prejudice decision the fact that some of the omitted evidence would have harmed Lenz's case.

- 80 -

Finally, Lenz alleges that the state court decision as to this claim was based on two unreasonable determinations of the facts in light of the state court record. First, he challenges the state court's conclusion that trial counsel had a strategic reason for deciding not to present mitigating evidence about his history of mental illness, noting that trial counsel never suggested such a strategy. Second, he challenges the conclusion that the jury heard most of the unpresented evidence through the testimony of Lenz and his mother, pointing out that extensive additional evidence existed, and that the jurors themselves have acknowledged that they needed to hear more evidence about Lenz's background.

I must presume the state court's findings of fact to be correct unless the petitioner makes a clear and convincing showing to the contrary. *Wiggins*, 539 U.S. at 528; § 2254(e)(1). The Supreme Court of Virginia suggested that trial counsel made a strategic decision when they decided not to present more evidence about Lenz's mental health diagnoses and treatments in light of the fact that the information was a "two[-]edged sword." *Lenz III*, 593 S.E.2d at 303. To rebut this conclusion, Lenz points to counsel's affidavit, but that affidavit does not discuss this issue. It states only that "[g]iven the facts of this case, we realized that there was little chance that Michael would not be found guilty of capital murder. Therefore, we believed that we had a much better chance of saving Michael's life through evidence presented during

- 81 -

the penalty phase of his trial." (App. 224 ¶ 12.) This is not clear and convincing evidence rebutting the presumption that counsel made a strategic decision.

In his next argument, Lenz mischaracterizes the Supreme Court of Virginia's findings. Contrary to Lenz's assertion, the court did not "determine[] that the jury heard the bulk of the unpresented evidence through the testimony of Lenz and his mother." (Pet. at 104.) The court merely observed, "[Lenz] acknowledges that both petitioner and his mother testified regarding his childhood and institutionalizations." *Lenz III*, 593 S.E.2d at 302. The court then described Mrs. Lenz's testimony. Finally, the court stated, "[t]he jury heard about petitioner's unloving and demanding step-father, his natural father's drinking problems, his suicidal tendencies, his low self-esteem and feelings of worthlessness, and his own extensive drug and alcohol use." *Id*. at 303-04. Nothing about these statements is incorrect, and Lenz's arguments that additional mental health evidence existed and that the jurors wanted more information about his background fail to contradict the court's findings by clear and convincing evidence.

### 5. CLAIM VI(E)—EVIDENCE REGARDING LENZ'S MENTAL ILLNESS.

Lenz claims that trial counsel unreasonably failed to develop relevant evidence regarding his mental illness. Lenz maintains that his social and psychiatric history

- 82 -

suggested the need for a competent neuropsychological evaluation and testimony from a mental health professional, and that the testing counsel were able to perform was insufficient.

The Supreme Court of Virginia addressed this claim in its state habeas rehearing opinion. *Lenz III*, 593 S.E.2d at 304. The court first "note[d] that petitioner is not asserting that counsel failed to engage in any investigation of petitioner's mental state; rather, petitioner's complaint is that counsel's development and presentation of the evidence was inadequate." *Id.* The court then reviewed the evidence, determining that

> [p]etitioner's argument relies primarily on the affidavit of a clinical neuropsychologist who tested petitioner and reviewed his records years after the capital murder trial. At the time of trial, petitioner had never been diagnosed with a mental illness of any type. Petitioner's psychiatric evaluations had identified psychological problems but never suggested a mental illness or "cognitive dysfunction" amounting to a mental illness.

*Id.* Finally, the court concluded, "[c]ounsel cannot be considered ineffective for failing to develop a 'mental illness' theory to use in mitigation when such a condition had not even been suggested by any expert or individual who had evaluated petitioner." *Id.* (citing *Poyner v. Murray*, 964 F.2d 1404, 1418-19 (4th Cir. 1992)).

Lenz argues that the state court decision was based on an unreasonable determination of the facts in light of the record because, contrary to the state court's finding, Lenz had been diagnosed with a mental illness. Furthermore, Lenz argues that

- 83 -

the court's finding contradicted its own previous observation that Lenz had "specific diagnoses and treatments" at various psychiatric institutions, and had been diagnosed with depression. Upon review of the record and applicable law, I find that the Supreme Court of Virginia's adjudication was reasonable and deny relief.

I must presume the state court's findings of fact to be correct unless the petitioner makes a clear and convincing showing to the contrary. *Wiggins*, 539 U.S. at 528; § 2254(e)(1). Lenz cites the following as evidence that, contrary to the state court's finding, he had been diagnosed with a mental illness prior to his trial: Lenz spent a significant amount of time in psychiatric facilities as a child; he had been diagnosed with depression and incipient schizophrenia; there were indicators of Lenz's potential cognitive impairments in his records; and it had been noted that Lenz had difficulty organizing his thoughts. (Pet. at 107.) The most important of these is the possibility that Lenz had been diagnosed with depression and incipient schizophrenia; the remainder of the facts are not inconsistent with the state court's conclusion.

The record does contain a report from Lenz's juvenile probation officer stating that the Commonwealth Psychiatric Center had diagnosed him with depression and the onset of schizophrenia nearly twenty years before the capital trial.[11] (App. 256.)

---

[11] An August 15, 1979, probation report from Juvenile and Domestic Relations Court in Manassas, Virginia described the Commonwealth Psychiatric Center's diagnoses of "severe depressive neurosis with suicidal ideation," and "Incipient Schizophenia [sic]." (App. 256.)

- 84 -

However, there is nothing in the record from the psychiatric center or any of Lenz's doctors to confirm that report, or to indicate whether Lenz's depression persisted, whether it rose to the level of a "mental illness," or whether Lenz ever developed schizophrenia. In addition, there is nothing in the record from Dr. Marcopolous, the neuropsychologist appointed to evaluate Lenz prior to trial. Lenz relies most strongly on an affidavit by Michael M. Gelbort, Ph.D., a clinical neuropsychologist who tested Lenz and reviewed his records years after the trial. *See Lenz III*, 593 S.E.2d at 304. Dr. Gelbort now opines that "there were indications in Mr. Lenz's history suggesting the presence of cognitive impairments" and "neuropsychological impairments," but consistent with the state court's determination, he does not indicate that those impairments constituted a mental illness.[12] (App. 347-50.)

---

A 1978 psychological evaluation from Dominion Psychiatric Treatment Center observed, "Michael is a depressed and angry young man who is characterized by a need to suppress feelings and thoughts that threaten to overwhelm him." (App. 245.) In 2001, Lenz's probation officer summarized Dominion's 1978 finding as a diagnosis of "severe depression." (App. 227.)

[12] Dr. Gelbort concluded,

[o]verall Mr. Lenz shows indication of long-standing neuropsychological impairments. His deficits take the form of suppressed language mediated reasoning and problem solving skills, as well as variable or sporadic performance on all forms (verbal and visual) of information processing. These deficits were present at the time of trial and could have been found with a full or comprehensive evaluation which was warranted and could have been performed.

- 85 -

This evidence is not sufficient to warrant my departure from the presumption that the state court's findings are correct. The state court recognized that Lenz had suffered from some "psychological problems," but determined that those "problems" had not resulted in the diagnosis of a "mental illness." *See Lenz III*, 593 S.E.2d at 304. Having reviewed the record and applicable law, I find nothing unreasonable about the state court's determination.

Even if I were to agree with Lenz and find that the state court incorrectly stated that he had "*never* been diagnosed with a mental illness," *Lenz III*, 593 S.E.2d at 304 (emphasis added), he still would not be entitled to relief on this claim. The court's more critical finding, that "[c]ounsel cannot be considered ineffective for failing to develop a 'mental illness' theory to use in mitigation when such a condition had not even been suggested by any expert or individual who had evaluated petitioner," *id.*, is correct. Lenz's juvenile probation officer was the only person to use language resembling a diagnosis and he is not "an[] expert or individual who had evaluated petitioner." *See id.*

I must also reject Lenz's argument that the state court's previous findings contradict its conclusion that Lenz had never been diagnosed with a mental illness.

_____

(App. 350 ¶ E.)

The state court's mention of "diagnoses and treatments" was a summary of Lenz's own argument, not a finding that Lenz had been diagnosed with a mental illness. The court stated, "[p]etitioner complains that this evidence is inadequate because it does not recite the specific diagnoses and treatments he underwent in the various institutions." *Lenz III*, 593 S.E.2d at 303. In addition, a review of the state court's opinion reveals that while the court stated, "[Lenz] was transferred to Dominion Psychiatric Treatment Center (Dominion) in Falls Church, Virginia . . . because he was showing depression and repressing anger," it did not make a specific finding that Lenz had been diagnosed with depression. *Id*. at 336. The alleged inconsistencies in the state court's opinion do not provide clear and convincing evidence that the court's conclusions were incorrect.

### 6. CLAIM VI(F)—FAILURE TO OBTAIN INDEPENDENT EXPERT ASSISTANCE.

Lenz claims that trial counsel were ineffective for failing to advise the trial court that Lenz required the services of an expert on the operation and classification of inmates in the Commonwealth of Virginia, after counsel decided two weeks prior to trial that such an expert was necessary. Lenz maintains that James E. Aiken, a long-time employee of the Virginia Department of Corrections ("VDOC"), could have

- 87 -

informed the jury about what would happen to Lenz in the prison system if he were sentenced to life in prison.

Lenz requested Aiken's appointment, but the trial court denied the motion "saying that the services of the expert were 'expensive' and that the information petitioner sought was available from persons who were in Virginia and who could 'tell you better how it's done.'" *Lenz III*, 593 S.E.2d at 304. Lenz's counsel noted his objection, but made no further argument. At trial, Lenz called the VDOC Director of Operations at Red Onion State Prison to testify about the system of prison classification and security.

The Supreme Court of Virginia first addressed this issue on direct appeal.[13] *Lenz I*, 544 S.E.2d at 304-05. The court observed that in *Husske v. Commonwealth*, 476 S.E.2d 920 (Va. 1996), it had applied Supreme Court precedent to determine that "the Commonwealth of Virginia, upon request, must provide indigent defendants with the basic tools of an adequate defense and that in certain instances, these basic tools may include the appointment of non-psychiatric experts." *Id.* at 305 (citing *Husske*, 476 S.E.2d at 925 (applying *Ake v. Oklahoma*, 470 U.S. 68 (1985))). However, the court explained, the appointment of an expert is not absolute: the defendant must show

---

[13]    On direct appeal, Lenz's argument was slightly different: that the due process and equal protection clauses of the Fourteenth Amendment entitled him to Aiken's expert assistance. *Lenz I*, 544 S.E.2d at 304-05.

a particularized need for such services, and that prejudice would result from the lack of expert assistance. *Id.* (citing *Ake*, 470 U.S. at 82-83). Applying these principles, the court held that

> the circuit court did not abuse its discretion in denying the defendant's request for the appointment of an expert . . . on the subject of "prison life." The . . . denial did not result in a fundamentally unfair trial, and we note that the defendant, who adduced testimony from witnesses who testified on the subject of "prison life," suffered no prejudice.

*Id.*

In his state habeas appeal, Lenz first phrased his claim as one of ineffective assistance of counsel. He claimed that trial counsel were ineffective for failing to argue that Aiken was needed on an additional ground—to rebut evidence of Lenz's future dangerousness. The Supreme Court of Virginia addressed this claim in its state habeas rehearing opinion, holding "[w]e reject this claim. Trial counsel appealed the denial of petitioner's motion for the appointment of the expert at issue on direct appeal. This Court resolved the issues, holding that *Ake* did not require the trial court to appoint the expert." *Lenz III*, 593 S.E.2d at 304-05 (citing *Lenz I*, 544 S.E.2d at 305). The court further held,

> To the extent petitioner is complaining that counsel's ineffectiveness is based on their failure to make the argument that the expert would be testifying not only to prison classifications and operation but also opining on petitioner's future dangerousness in the context of a prison setting, we also reject the claim. We have held that Code [section] 19.2-264.2 does

- 89 -

not limit the consideration of whether the defendant would pose a continuing threat to society to a 'prison society' because a defendant would be sentenced to life imprisonment without parole. *Lovitt v. Commonwealth*, . . . 537 S.E.2d 866, 879 ([Va.] 2000). While *Lovitt* was decided one month after petitioner's sentencing proceeding, we cannot conclude that counsel was ineffective for failing to advance an argument that we have subsequently rejected.

*Lenz III*, 593 S.E.2d at 304-05.

Lenz now argues that the state court adjudication was contrary to and an unreasonable application of *Ake v. Oklahoma* because the state court failed to distinguish between "independent" and "neutral" experts, and because the state court incorrectly relied on *Lovitt*, a case decided after Lenz's trial, to determine the reasonableness of counsel's conduct at trial. Upon review of the record and applicable law, I find that the Supreme Court of Virginia's adjudication was reasonable and deny relief.

A state court adjudication is considered "contrary to" clearly established federal law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts," and it constitutes an "unreasonable application" of clearly established federal law if the court identifies the governing legal principle, but "unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 412-13.

- 90 -

Lenz first challenges the Supreme Court of Virginia's application of *Ake* by arguing that he was denied his right "to an *independent* expert who can *oppose* the [S]tate's evidence," and was instead given "an expert who is 'neutral' or simultaneously assisting the prosecution." (Pet. at 109 (citing *Ake*, 470 U.S. at 81, 84).) Lenz asserts that the VDOC employees on whom counsel relied for evidence about prison classification and security were not independent because they were employees of the same agency that was investigating and prosecuting the case against him. This argument assumes that Lenz was entitled to the assistance of an expert, and asserts that he was given the wrong type of expert. However, the Supreme Court of Virginia explicitly held that Lenz was not entitled to expert assistance under *Ake*. *Lenz III*, 593 S.E.2d at 304-05; *Lenz I*, 544 S.E.2d at 305. I cannot say that the state court's determination was contrary to, or resulted from an unreasonable application of *Ake*, based upon this argument.

Lenz also argues that the Supreme Court of Virginia's adjudication was contrary to *Ake* because the court relied on *Lovitt*, a case decided after Lenz's trial, to determine the reasonableness of counsel's conduct at trial. In *Lovitt*, the court rejected the argument that the only society relevant to future dangerousness is prison society. *Lovitt*, 537 S.E.2d at 879. Lenz's theory is that if trial counsel had argued Aiken would testify about Lenz's future dangerousness in the prison, and if the court

had not incorrectly applied *Lovitt*, then Lenz could have made the need and prejudice showing necessary to have Aiken appointed under *Ake*. Again, I disagree.

Had Aiken testified, he would have expressed his opinion that Lenz's violence toward Parker was not a precursor for similar events in the future. (App. 358, 361-62.) He would have explained why one VDOC official's statement that there is a higher incidence of reported violence in supermax prisons does not necessarily indicate that a supermax prison is more violent than others. (App. 367.) Finally, Aiken would have countered several VDOC officials' testimony that inmates are capable of making weapons in a supermax prison by pointing out that the probability of doing so is much lower in supermax prisons than in others. (*Id.*)

Contrary to Lenz's contention, this testimony from Aiken would not have justified his appointment under *Ake*, as the Supreme Court of Virginia has applied that decision to non-psychiatric experts. Lenz would have had to show a particularized need for Aiken's services, and that prejudice would result from the lack of Aiken's assistance. *See Husske*, 476 S.E.2d at 925. Aiken could have told the jury a lot about day-to-day life in the prison system, but he was not the proper expert to opine about Lenz's future dangerousness. Whether Lenz's attack on Parker was likely to be repeated with other inmates is testimony more properly offered by a psychological

- 92 -

expert. Indeed, Lenz was appointed a neuropsychologist for this, among other, purposes.

Furthermore, the fact that *Lovitt* was not decided until after Lenz's sentencing does not justify a departure from the Supreme Court of Virginia's determination. *Lovitt* was the first case from the Supreme Court of Virginia to expressly state that prison is not the only society relevant to the future dangerousness determination when a defendant is ineligible for parole. However, *Lovitt* made no change in the law; this principle was already apparent. *See Lovitt*, 537 S.E.2d at 879 (noting that Va. Code section 19.2-264.2 would have to be rewritten to limit consideration to "prison society" when a defendant is ineligible for parole).

Finally, any error on counsel's part does not create a "reasonable probability" that the result of the proceeding would have been different, as is required of any ineffective assistance of counsel claim. The jury heard about the conditions Lenz would encounter in a supermax prison from the two VDOC witnesses, who also testified that Lenz "had never given them any problems while he was under their supervision." *Lenz I*, 544 S.E.2d at 303. Although Aiken's testimony would have differed from that of the VDOC officials on some points, such as the frequency with which supermax prison inmates can make weapons, it would not have been contradictory to the VDOC testimony. In addition, Lenz's dangerousness in prison

was not the only issue relevant to the jury's future dangerousness determination.  For example, the jury had heard about Lenz's previous convictions for breaking and entering and for possessing a firearm after having been convicted of a felony.  *Lenz*, 261 Va. at 457.  The state court's determination involved no unreasonable application of, and was not contrary to, *Ake*.

### 7. CLAIM VI(G)—CUMULATIVE PREJUDICE.

Lenz claims that counsel's failures individually and cumulatively prejudiced him. The Supreme Court of Virginia addressed this claim in its state habeas rehearing opinion. *Lenz III*, 593 S.E.2d at 305.  The court held that "[h]aving rejected each of petitioner's individual claims, there is no support for the proposition that such actions when considered collectively have deprived petitioner of his constitutional right to effective assistance of counsel."  *Id.* (citing *Mueller v. Angelone*, 181 F.3d 557, 586 n.22 (4th Cir. 1999); *Fisher v. Angelone*, 163 F.3d 835, 852 (4th Cir. 1998)).  Lenz argues that the state court determination is contrary to *Williams v. Taylor*, 529 U.S. 362 (2000), because *Williams* overruled the cases upon which the state court relied.

Lenz's argument has no merit.  *Williams* does not stand for the proposition that several ineffective assistance of counsel claims, none of which constituted deficient performance or prejudice, can collective prejudice a defendant.  *See Williams*, 529 U.S. at 395 (finding that counsel's performance was unreasonable).  Furthermore,

- 94 -

*Williams* did not "effectively overrule" the Fourth Circuit's decisions in *Mueller* and *Fisher*. (*See* Pet. at 117.) Those cases remained good law after *Williams* and continue to be cited in the Fourth Circuit today. *See, e.g., United States v. Russell*, 34 Fed. Appx. 927, 927 (4th Cir. 2002) (unreported) (explaining its holding in *Fisher* that "it is not appropriate to consider the cumulative effect of attorney error when the individual claims of ineffective assistance do not violate the defendant's constitutional rights"); *Leary v. Garraghty*, 155 F. Supp. 2d 568, 577 (E.D. Va. 2001) (explaining the Fourth Circuit's *Fisher* holding "that ineffective assistance of counsel claims . . . must be reviewed individually, rather than collectively").

Finally, the Supreme Court of Virginia's determination that a series of reasonable actions by Lenz's counsel could not cumulatively prejudice him was proper. Simply put, there was nothing to cumulate in Lenz's case. This principle has been repeated several times since *Williams*. *See Russell*, 34 Fed. Appx. at 928 (citing *Moore v. Reynolds*, 153 F.3d 1086, 1113 (10th Cir. 1998) (holding "cumulative error analysis applies where there are two or more actual errors; it does not apply to the cumulative effect of non-errors")); *Hall v. Luebbers*, 296 F.3d 685, 692 (8th Cir. 2002) ("a habeas petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test"); *Hough v. Anderson*, 272 F.3d 878, 907 n.14 (7th Cir. 2001) ("if there are no errors or a single error, there can be no

- 95 -

cumulative error"). The Supreme Court of Virginia's adjudication of this claim was reasonable under *Williams*.

### F. CLAIM VII—COUNSEL'S FAILURES
#### ON DIRECT APPEAL.

Lenz claims that his rights under the Eight and Fourteenth Amendments were violated by appellate counsel's failure to raise meritorious issues on direct appeal. Lenz further claims that these failures necessitate a finding of prejudice and a resulting finding of ineffective assistance of counsel under *Strickland*. Specifically, Lenz alleges that trial counsel were ineffective for failing to ask the Supreme Court of Virginia to conduct a statutory arbitrariness review of the verdict forms used at his trial, and for failing to assert that the Supreme Court of Virginia's proportionality review was flawed.[14]

Lenz raised neither of these arguments before the state court; therefore, his claim could be treated as having been procedurally defaulted. *See Roach v. Angelone*, 176 F.3d 210, 215 (4th Cir. 1999) (citing *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996)). However, because the Warden has failed to raise the issue of procedural

---

[14] Although Lenz alleges in his petition that counsel were ineffective for failing to raise these issues before "this Court," I will assume that phrasing was a mistake and Lenz meant "the Supreme Court of Virginia." (*See* Pet. at 119.)

- 96 -

default, and may have done so for strategic reasons, and because Lenz has not had an opportunity to address the issue, I consider the claim de novo and on its merits.[15]

Virginia law provides that in addition to considering any alleged trial errors argued on appeal by a defendant sentenced to death, the Supreme Court of Virginia must also determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor" and "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *Roach*, 176 F.3d at 215 (citing Va. Code Ann. § 17-110.1(C)(1), (2) ([Michie] 1983)). The first determination is sometimes called "arbitrariness review" and the second, "proportionality review." Lenz's claim relates to both types of review.

First, Lenz argues that his appellate counsel were ineffective for failing to ask the Supreme Court of Virginia to overturn his sentence on direct appeal as part of an arbitrariness review. He contends that the verdict forms were so "improper and confusing" that they led to arbitrary imposition of the death penalty, which the court

_____

[15] The issue of procedural default is generally an affirmative defense that the respondent must raise and preserve, and the respondent has not done so in this case. *See id.* (citing *Yeatts v. Angelone*, 166 F.3d 255, 261 (4th Cir. 1999)). Even though federal habeas courts may still decide a petitioner's claim on the basis of procedural default in such circumstances, *Yeatts v. Angelone*, 166 F.3d 255, 261 (4th Cir. 1999), I choose not to do so here.

- 97 -

had a duty to set aside. In support of this argument, Lenz cites *Atkins v. Commonwealth*, 510 S.E.2d 445 (1999), and *Powell v. Commonwealth*, 552 S.E.2d 344 (2001).

When reviewing a sentence for arbitrariness, the Supreme Court of Virginia ascertains whether the errors alleged "created an atmosphere of passion and prejudice that influenced the jury's sentencing decision" or otherwise improperly influenced the jury in favor of imposing the death penalty. *See Elliott v. Commonwealth*, 593 S.E.2d 270, 291 (Va. 2004); *Jackson v. Commonwealth*, 590 S.E.2d 520, 537 (Va. 2004). Even when there is no finding of reversible error, the court may still determine that a sentence of death was imposed erroneously as the result of passion, prejudice, or other arbitrary factors. *Emmett v. Commonwealth,* 569 S.E.2d 39, 44 (Va. 2002). Therefore, the court considers the potential impact all the alleged errors may have had on the jury's decision to impose the death sentence. *Id.*

In Lenz's case, the Supreme Court of Virginia observed,

> the defendant does not contend that the sentence of death imposed upon him was the influence of passion, prejudice, or other arbitrary factor. Nonetheless, we have reviewed the record, and we find no evidence that any such factor was present or influenced either the jury's or the circuit court's sentencing decision.

*Lenz I*, 544 S.E.2d at 309.

- 98 -

Lenz has not shown that the Supreme Court of Virginia failed to consider the verdict form issue in its review of the death sentence; the court conducted "a review of the record." *Id.* The court specifically mentioned the verdict form issue in its opinion, asking the parties to further brief it. *Id.* at 311. Nevertheless, the court's examination revealed no evidence that any arbitrary factor was present or influenced the sentencing decision. The verdict forms used in the sentencing phase of Lenz's trial were "almost identical" to the language then required by statute and which, at that time, had not yet been invalidated by the Supreme Court of Virginia. *See Lenz II*, 579 S.E.2d at 197; *Lenz III*, 593 S.E.2d at 295. I must presume that the Supreme Court of Virginia conducted its review of the record in good faith and considered all the evidence in that record, including the verdict forms. *See Buchanan v. Angelone*, 103 F.3d 344, 351 (4th Cir.1996). The record indicates that the Supreme Court of Virginia conducted the statutorily-mandated arbitrariness review in a thorough and reasoned manner.

I cannot say that counsel's omission was objectively unreasonable in light of all the circumstances. *See Strickland*, 466 U.S. at 688. Furthermore, even if appellate counsel had asked the Supreme Court of Virginia to overturn Lenz's sentence on direct appeal as part of an arbitrariness review, there is no reasonable probability that they would have prevailed. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000)

- 99 -

(explaining that the *Strickland* prejudice standard as applied to claims of appellate counsel's ineffective assistance requires a defendant to "show a reasonable probability that, but for his counsel's unreasonable failure . . . , he would have prevailed on his appeal").  Having failed to demonstrate either unreasonable performance or prejudice as required by *Strickland*, Lenz's claim as to this issue is rejected.

Next, Lenz argues that appellate counsel were ineffective for failing to argue that the Supreme Court of Virginia improperly conducted its proportionality review. Specifically, he alleges that the court's proportionality review did not "contrast the death sentence imposed in this case with sentences that have been imposed across the Commonwealth (1) for similar crimes (i.e. murder of an inmate) *and* (2) against similar defendants."  (Pet. at 119.)

Proportionality review is entirely a creature of state statute; it is not required by either the Constitutions of Virginia or the United States.  *Roach*, 176 F.3d at 216-17 (citing *Pulley v. Harris*, 465 U.S. 37, 50-51 (1984)).  When conducting its review, the Supreme Court of Virginia examines "whether other sentencing bodies in [Virginia] generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant."  *Goins v. Commonwealth*, 470 S.E.2d 114, 131-32 (Va. 1996) (citing *Jenkins v. Commonwealth*, 423 S.E.2d 360, 371 (Va. 1992); *see also* Va. Code Ann. § 17-110.1(C)(2)).  To fulfill the statutory mandate to consider the

- 100 -

"crime and the defendant," the court must consider certain factors including, but not limited to, "the method of killing, the motive for the crime, the relationship between the defendant and the victim, whether there was premeditation, and the aggravating factors found by the sentencing body." *Emmett*, 569 S.E.2d at 47. Code section 17.1-313(C)(2) does not require the court to review *identical* crimes. *Remington v. Commonwealth,* 551 S.E.2d 620, 638 (Va. 2001). Rather, it requires review of crimes that are comparable or similar. *Id*.

To complete its proportionality review in this case, the Supreme Court of Virginia

> examined records in all capital murder cases previously reviewed by this Court when, as here, the death penalty was imposed based upon Code [section] 18.2-31(3), the capital murder of an inmate while the defendant was confined in a state or local correctional facility. Additionally, we have examined the records in all capital murder cases previously reviewed by this Court when the sentence of death was based upon aggravated battery, vileness, and future dangerousness and the victim died as a result of multiple stabbings.

*Lenz I*, 544 S.E.2d at 310-11. The court considered the fact that Lenz was an inmate at the time of the murder, that the victim was another inmate, that the killing was done by stabbing, and the aggravating factors. *Id*. at 310. Contrary to Lenz's assertion, the Supreme Court of Virginia did consider similar crimes and similar defendants.

- 101 -

Given that the proportionality review is entirely a creature of state statute, and given that Lenz has failed to show that the Supreme Court of Virginia erred in its proportionality review, I find that counsel was not unreasonable for failing to raise this argument, as it would have been a weak argument at best. Additionally, Lenz was not prejudiced by counsel's failure to raise the argument, as it most likely would have been decided against him. Having failed to demonstrate either unreasonable performance or prejudice, as required by *Strickland*, Lenz's claim as to this issue is rejected.

Having reviewed the record and applicable law, I find Lenz's claim to be without merit and deny relief.

### G. CLAIM VIII—CONSTITUTIONALITY OF THE DEATH PENALTY IN VIRGINIA.

Lenz claims that the death penalty scheme in Virginia is unconstitutional under the Eight and Fourteenth Amendments because it is "random, arbitrary, and freakish." Lenz cites geographic disparity in the prosecution of capital offenses, the role race plays in imposition of the death penalty, the disproportionate number of lower-income defendants sentenced to death, and the low rate of reversals as evidence that Virginia imposes the death penalty in a random and arbitrary manner.

The Supreme Court of Virginia first considered Lenz's claim on direct appeal, resolving it with a cite to *Mickens v. Commonwealth*, 478 S.E.2d 302 (Va. 1996),

which held that Virginia provides meaningful review of all death penalty cases, and that those review procedures are constitutional. *Lenz I*, 544 S.E.2d at 304 (citing *Mickens*, 478 S.E.2d at 305). In his state court petition, Lenz supplemented his claim with new information from a series of death penalty studies conducted after his direct appeal. In its initial state habeas petition, the Supreme Court of Virginia determined "[t]his argument was raised on direct appeal and petitioner may not assert this argument again in this habeas corpus proceeding." *Lenz II*, 579 S.E.2d at 198 (citing *Slayton*, 205 S.E.2d at 682).

Lenz first argues that this court should review his claim de novo. He contends that the Supreme Court of Virginia "set aside" its determination of this claim when it vacated its initial habeas opinion and, because the court did not consider the claim again in its rehearing opinion, there is no state court adjudication in effect. As I did in Claim V, I reject this argument because the state court intended its rehearing opinion to supplement, not vacate, its prior holding.

Alternatively, Lenz argues that this court should review his claim de novo because the claim resolved by the state court on direct appeal was not, in fact, the same as the claim he now asserts in his habeas petition.

> [T]he direct appeal claim did not allege that Virginia's death penalty was
> unconstitutional based on a series of recently-issued studies . . .
> [because] none of these studies had been conducted and/or reported at

the time of Lenz's trial. Thus, the claim Lenz raised in state habeas proceedings was a new one based on new facts. The state court did not adjudicate this claim, thus there is no state court decision for this Court to scrutinize.

(Pet. at 125-26.)

The respondent asserts that Lenz is not entitled to de novo review for two reasons: (1) to the extent that his state habeas claim was different from that presented on direct appeal, the Supreme Court of Virginia properly rejected it as having been procedurally barred, *Lenz II*, 579 S.E.2d at 198, and (2) to the extent that Lenz's state habeas claim was the same as the claim presented on direct appeal, the court adjudicated the claim on its merits. I agree with the Warden's interpretation of the procedural history and, because it is unclear from the record what Lenz's precise argument was on direct appeal, I will address both possibilities—that his claim was procedurally defaulted, or that it was adjudicated on the merits.

Assuming that his claim was procedurally defaulted, Lenz would have to demonstrate cause and prejudice before this court could review that claim. To show cause, a petitioner must demonstrate that "objective factors" external to his defense impeded him from raising his claim at an earlier stage. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Although he does not specifically label it such, Lenz asserts as cause the fact that the studies on which he relies had not been published at the time of his

- 104 -

direct appeal. The discovery of new facts, meaning "the factual basis for a claim," can constitute cause. *George v. Angelone*, 100 F.3d 353, 364 (4th Cir. 1996) (citing *Murray*, 477 U.S. at 488). However, the fact that Joint Legislative Audit and Review Commission ("JLARC") report[16] on which Lenz relies was not published until after his direct appeal is insufficient to support the argument that the factual basis for his claim was unavailable.

A petitioner cannot establish cause when the facts underlying his claim were in existence and were available upon a reasonably diligent search. *Rose v. Lee*, 252 F.3d 676, 688 (4th Cir. 2001) (citing *Murphy v. Netherland*, 116 F.3d 97, 100 (4th Cir. 1997)). At least some of the facts upon which the JLARC study is based were available to counsel at the time of Lenz's direct appeal. *See Rose*, 252 F.3d at 688 n.10 (statistics underlying economic and racial discrimination claims, as well as records indicating which capital defendants were represented by court-appointed

---

[16] The JLARC report was the product of a year-long study commissioned by the Virginia General Assembly. Joint Legislative Audit and Review Commission of the Virginia General Assembly, *Review of Virginia's System of Capital Punishment* (2000), *available at* http://jlarc.state.va.us/reports/rpt274.pdf. The purpose of the study was to examine capital punishment in Virginia, paying particular attention to "two key aspects of capital punishment . . . : the use of prosecutorial discretion by Commonwealth Attorneys in the application of the State's death penalty statutes; and the fairness of the judicial review process for persons who have been sentenced to die." *Id*. at Preface.

Case 7:04-cv-00347-JPJ   Document 58-1   Filed 05/20/05   Page 105 of 107   Pageid#: 434

counsel are available). Consequently, cause does not exist to excuse any procedural default of Lenz's claim.

Furthermore, even if Lenz could show cause for his default, he would not be able to demonstrate prejudice, which requires a showing that the alleged constitutional violation worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional magnitude. *See Murray*, 477 U.S. at 492. The Supreme Court and the Fourth Circuit both have held that statistical information alone is insufficient to prove the types of claims Lenz asserts. *See McCleskey v. Kemp*, 481 U.S. 279, 297 (1987) (race statistics); *Briley v. Booker*, 746 F.2d 225, 227 (4th Cir. 1984) (race statistics); *Roach v. Martin*, 757 F.2d 1463, 1481 (4th Cir. 1985) (race statistics). The JLARC statistics do not prove that geographic location, race, wealth, or some impermissible review factor enters into any capital sentencing decisions, or that such circumstances were a factor in Lenz's particular case. *See* JLARC at III; *see also McCleskey*, 481 U.S. at 308 (making the same observation about a statistical study on race). "Statistics at most may show only a likelihood that a particular factor entered into some decisions." *McCleskey*, 481 U.S. at 308. Therefore, Lenz has not made the requisite showing to excuse any procedural default of this claim.

In the alternative, assuming that Lenz's claim was not procedurally defaulted, but was adjudicated on the merits, he would have to show that the state court's adjudication "resulted in a decision that was contrary to or involved an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1). For the same reasons Lenz could not establish prejudice from any default, he cannot make this showing.

Having reviewed the record and applicable law, I find that Lenz has failed to demonstrate cause and prejudice for any procedural default of this claim and, alternatively, that the Supreme Court of Virginia's adjudication of this claim was reasonable. Therefore, I deny relief.

V. CONCLUSION.

For all of the reasons stated above, the respondent's Motion to Dismiss the Petition for a Writ of Habeas Corpus must be granted.

DATED: May 20, 2005

/s/ JAMES P. JONES
Chief United States District Judge

- 107 -